# United States Court of Appeals for the Federal Circuit

---

**SPIREON, INC.,**
*Appellant*

**v.**

**FLEX LTD.,**
*Appellee*

---

2022-1578

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91252138.

---

Decided:  June 26, 2023

---

MICHAEL J. BRADFORD, Luedeka Neely Group, PC, Knoxville, TN, argued for appellant.  Also represented by MARK P. CROCKETT.

MATTHEW CHRISTIAN HOLOHAN, Sheridan Ross PC, Denver, CO, argued for appellee.  Also represented by PAMELA NICOLE HIRSCHMAN, JULIA SHURSKY.

---

Before DYK, MAYER, and REYNA, *Circuit Judges.*

DYK, *Circuit Judge.*

Spireon, Inc. appeals a Trademark Trial and Appeal Board ("Board") decision sustaining Flex Ltd.'s opposition to the registration of Spireon's FL FLEX mark on the ground of likelihood of confusion with Flex's three registered marks FLEX, FLEX (stylized), and FLEX PULSE. We vacate and remand.

## BACKGROUND

Spireon filed a trademark application seeking to register the mark FL FLEX on October 25, 2018, for "[e]lectronic devices for tracking the locations of mobile assets in the nature of trailers, cargo containers, and transportation equipment using global positioning systems and cellular communication networks." J.A. 89. On September 1, 2019, an Examining Attorney approved the application for publication to the Principal Register, and thereafter it was published for opposition. On November 7, 2019, Flex opposed registration on the grounds of priority and likelihood of confusion with Flex's previously registered marks FLEX, FLEX (stylized), and FLEX PULSE.

## I.    Flex's Registered Marks

Flex's FLEX mark was registered July 12, 2016, in International Classes[1] ("classes") 35, 39, 40, and 42, for services including, in relevant part, "supply chain management services; transportation logistics services, namely, arranging the transportation of goods for others; logistics management in the field of electronics; . . . [and] inventory management services for others." J.A. 95.

---

[1] The classes are categories of various goods and services as established by the international classification system under the Nice Agreement Concerning the International Classification of Goods and Services for the Purposes of the Registration of Marks. *See* 37 C.F.R. §§ 2.85, 6.1.

Flex's FLEX (stylized) mark was registered on April 5, 2016, in classes 35, 40, and 42 for services including, in relevant part, "supply chain management services; transportation logistics services, namely, arranging the transportation of goods for others; logistics management in the field of electronics; . . . [and] inventory management services for others." J.A. 98.

Flex's FLEX PULSE mark was registered on December 12, 2017, in classes 9, 35, and 42, for both goods and services. FLEX PULSE was registered for the goods:

> [c]omputers; computer software for use in supply chain management, logistics and operations management, quality control, inventory management, and scheduling of transportation and delivery; [c]omputer software in the nature of downloadable mobile applications for use in supply chain management, logistics and operation management, quality control, inventory management, and scheduling of transportation and delivery[.]

J.A. 101. The FLEX PULSE mark was also registered for services including, in relevant part, "[s]upply chain management services; logistics management in the field of electronics; . . . inventory control and inventory management services" as well as "providing temporary use of non-downloadable computer software for supply chain management, logistics and operation, inventory control, inventory management and tracking of documents and products over computer networks, intranets and the internet in the field of supply chain management." J.A. 101.

## II.  The Board's Decision

On January 25, 2022, the Board sustained Flex's opposition.[2]  The Board considered whether there was a likelihood of confusion based on relevant factors enumerated in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) [hereinafter *DuPont* factors].

In its consideration of the first *DuPont* factor, the similarity of the marks, the Board addressed the strength of Flex's marks, including the marks' conceptual and commercial strength.  The Board first addressed thirty third-party trademark registrations and applications, which "may bear on conceptual weakness if a term is commonly registered for similar goods or services."  J.A. 58 (quoting *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 U.S.P.Q.2d 1043, 1057 (T.T.A.B. 2017)).  The Board excluded from consideration ten registrations on grounds not challenged on appeal.  Of the remaining twenty registrations, the Board assigned "low probative value," J.A. 60, to fifteen marks that contained "compound terms including another word or letters in addition to 'FLEX' that change the overall meaning and/or commercial impression of the marks as a whole."  J.A. 59.  The Board then considered the five remaining marks: FLEX, including for "[c]omputer software used for logistics management"; FLEX, including for "[c]omputer software platform for use [i]n . . . managing supply chains"; LOAD FLEX for "[c]omputer software development in the field of freight transportation"; VALUE FLEX for "[p]acking, loading and unloading of portable cargo containers; transport and delivery of portable cargo containers"; and FLEX, including for "[a]dvanced transportation controller for managing . . . traffic signal control and

---

[2]    On February 10, 2022, the Board issued a corrected decision.  All citations in this opinion are to the corrected version.

integration with connected or automated vehicles." J.A. 60. The Board concluded that:

> [w]hile the Federal Circuit has held that "**extensive** evidence of third-party use and registrations is 'powerful on its face,'" . . . the record of third-party registrations in this case is far less than the amount of evidence found convincing in *Jack Wolfskin* and *Juice Generation* wherein "considerable evidence of third-party registration[s]" of similar marks was shown.

J.A. 61 (alteration in original) (quoting *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373–74 (Fed. Cir. 2015)) (citing *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334 (Fed. Cir. 2015)). The Board found that the evidence of third-party registrations did not show that Flex's marks were conceptually weak and concluded that Flex's marks were inherently distinctive.

The Board then analyzed the commercial strength of FLEX, FLEX (stylized), and FLEX PULSE. The Board considered evidence of commercial strength, such as evidence that Flex has used its marks in commerce since 2015, but ultimately found insufficient evidence to show "any degree of commercial recognition by the relevant purchasing public." J.A. 66. The Board also considered whether evidence of fifteen third-party websites proved Flex's marks to be commercially weak. Of the fifteen uses, the Board found four of the uses to be "associated with irrelevant goods and services," J.A. 64, and three of the marks to contain "additional elements that cause[d]" the third-party marks "to be less similar to [Flex's] marks than is [Spireon's] mark." J.A. 65. The Board assigned these marks "low probative value," J.A. 64, and then considered the eight remaining uses. The Board again found that eight third-party uses was "far less than the amount of evidence found convincing in *Jack Wolfskin* and *Juice Generation*" and appeared to

give the evidence no weight in the analysis.  J.A. 65–66.
The Board did not address the third-party registrations,
without proof of use, in its analysis of commercial strength.

Ultimately, the Board found the marks to be inherently
distinctive and afforded the marks "the normal scope of
protection to which inherently distinctive marks are enti-
tled."  J.A. 66 (quoting *Bell's Brewery, Inc. v. Innovation
Brewing*, 125 U.S.P.Q.2d 1340, 1347 (T.T.A.B. 2017)).

The Board then considered the similarity of the marks,
analyzing Spireon's FL FLEX against FLEX, FLEX (styl-
ized), and, mistakenly, "FLEX PLUS" rather than "FLEX
PULSE."  The Board found the marks highly similar and
concluded that the first *DuPont* factor supported a finding
of likelihood of confusion.

Under the second *DuPont* factor, the similarity or dis-
similarity of the parties' goods and services, the Board
found that the goods and services were related and comple-
mentary.  For the third *DuPont* factor, the similarity or dis-
similarity of trade channels and classes of consumers, the
Board found that the trade channels and classes of consum-
ers overlapped.  Finally, in its consideration of other argu-
ably probative facts under *DuPont* factor thirteen, the
Board declined to find that Spireon's adoption of FL FLEX
was made in bad faith after Spireon had notice of Flex's
marks.  The Board did not consider the other *DuPont* fac-
tors, recognizing that the Board must only consider "each
*DuPont* factor for which there is evidence and argument."
J.A. 56 (citing *In re Guild Mortg. Co.*, 912 F.3d 1376, 1380
(Fed. Cir. 2019)).

Ultimately, the Board found that there was a likelihood
of confusion between Spireon's and Flex's marks and, ac-
cordingly, sustained Flex's opposition.  Spireon appealed.
We have jurisdiction under 15 U.S.C. § 1071(a)(1) and
28 U.S.C. § 1295(a)(4)(B).

## DISCUSSION

Likelihood of confusion is a question of law based on underlying factual findings regarding the *DuPont* factors. *In re i.am.symbolic, llc*, 866 F.3d 1315, 1322 (Fed. Cir. 2017). We review the Board's legal conclusions de novo and factual findings for substantial evidence. *Id.*

I

Our court in trademark opposition proceedings, like every other circuit in the infringement context, considers the strength of the prior user's mark as a central factor in the likelihood of confusion analysis. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:43 (5th ed. 2023). Two of the *DuPont* factors (the fifth and sixth) consider strength. The fifth *DuPont* factor, "[t]he fame of the prior mark (sales, advertising, length of use)," 476 F.2d at 1361, is a measure of the mark's strength in the marketplace. *See Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017). That factor is not at issue here.

What is at issue is the sixth *DuPont* factor, "[t]he number and nature of similar marks in use on similar goods," 476 F.2d at 1361, which is a measure of the extent to which other marks weaken the assessed mark. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005).

There are two prongs of analysis for a mark's strength under the sixth factor: conceptual strength and commercial strength. 2 McCarthy, *supra*, § 11:80; *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353–54 (Fed. Cir. 2010). Conceptual strength is a measure of a mark's distinctiveness, *Chippendales*, 622 F.3d at 1353, and distinctiveness is "often classified in categories of generally increasing distinctiveness[:] . . . (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Distinctiveness is

relevant to a mark's overall strength in the likelihood of confusion analysis. 2 McCarthy, *supra*, § 11:73.

Relevant here, descriptive marks "directly and immediately convey[] some knowledge of the characteristics of a product or service," *id.* § 11:16, while suggestive marks "suggest[], but do[] not directly and immediately describe, some aspect of the goods or services," 2 McCarthy, *supra*, § 11:62. Under our precedent, "[m]arks that are descriptive or highly suggestive are entitled to a narrower scope of protection, *i.e.*, are less likely to generate confusion over source identification, than their more fanciful counterparts." *Juice Generation*, 794 F.3d at 1339 (citations omitted); *see also id.* (explaining that third-party registrations "are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak" (citations and internal quotation marks omitted)); *Jack Wolfskin*, 797 F.3d at 1373–74.

Commercial strength, on the other hand, is "the marketplace recognition value of the mark." McCarthy, *supra*, § 11:80. Commercial strength is a question of "whether consumers in fact associate the . . . mark with a unique source," *id.* (citation omitted), and can be shown by, for instance, exclusive use of a mark in the marketplace, advertising and marketing, and sales. *See Bridgestone Ams. Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1336 (Fed. Cir. 2012).

## II

The Board here erred in analyzing conceptual strength under the first *DuPont* factor, the similarity of the marks, rather than the sixth *DuPont* factor. This error, however, is not claimed to have affected the overall correctness of the Board's analysis. But the Board made other errors of significance.

First, the Board erred in its analysis of conceptual strength. The existence of third-party registrations on similar goods can bear on a mark's conceptual strength. *Juice Generation*, 794 F.3d at 1339. Specifically, third-party registrations containing an element that is common to both the opposer's and the applicant's marks can show that that element has "a normally understood and well-recognized descriptive or suggestive meaning." *Jack Wolfskin*, 797 F.3d at 1374 (quoting *Juice Generation*, 794 F.3d at 1339). Accordingly, we have considered the existence of third-party registrations under the sixth *DuPont* factor. *See id.*

The Board here erred in its analysis of conceptual strength by discounting composite third-party registrations, even though Spireon's mark is itself a composite mark. The Board attributed low probative value to fifteen registered marks with "compound terms including another word or letters in addition to 'FLEX.'"[3] J.A. 59. After excluding these marks (along with other categories of marks for different reasons), the Board concluded that the record of third-party uses and registrations in this case was "far less than the amount of evidence found convincing in *Jack Wolfskin* and *Juice Generation* wherein 'extensive evidence of third-party uses' of similar marks was shown." J.A. 65 (citation omitted) (quoting *Jack Wolfskin*, 797 F.3d 1374); *see also* J.A. 61 (similar).

The Board appeared to justify this by finding that the "FL" prefix could be ignored. *See* J.A. 70; *see also* J.A. 59 ("15 of these marks are compound terms including another word or letters in addition to 'FLEX' that change the overall meaning and/or commercial impression of the marks as a whole, making them less similar to [Flex's] marks than is [Spireon's] mark." (citation omitted)). This was error.

---

[3] The Board did consider two compound marks, LOAD FLEX and VALUE FLEX, as having greater probative value in its analysis. J.A. 60.

While it is permissible to find that the FL prefix did not eliminate possible confusion with FLEX without the prefix, the Board cannot effectively eliminate consideration of other composite marks in these circumstances.

Where marks share a common segment, "[t]hird party registrations are relevant to prove that [the shared] segment of the composite marks . . . has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." 2 McCarthy, *supra*, § 11:90. Evidence of composite third-party registrations is also relevant because:

> Such registrations could . . . show that the PTO, by registering several marks with such a common segment, recognizes that portions of such composite marks other than the common segment are sufficient to distinguish the marks as a whole and to make confusion unlikely. That is, the presence of such a descriptive or suggestive weak segment in conflicting composite marks is not per se sufficient to make confusion likely.

*Id.*

At least where the registrations and application are for non-identical marks, as they are here, it is error for the Board to effectively disregard third-party composite marks. The composite third-party registrations are relevant to the question of whether the shared segment—in this case, "flex"—has a commonly understood descriptive or suggestive meaning in the field and whether there is a crowded field of marks in use. The composite marks have probative value and should have been included in the Board's analysis.

The Board compounded this error by apparently giving no weight to Spireon's argument that "flex" is highly suggestive because it is a shortened form of "flexible." J.A. 57–

58; *see* J.A. 1181.  The Board disregarded this argument because "[Spireon] does not direct us to any evidence that [Flex's] marks are highly suggestive or weak in connection with the goods or services recited in [Flex's] registrations." J.A. 58.  But, as described above, Spireon <u>did</u> produce evidence, in the form of third-party registrations, regarding the mark's conceptual weakness as applied to the relevant industry.  It seems apparent that the term "flex" "hint[s] at some attribute of the goods or services," 2 McCarthy, *supra*, § 11:64 (capitalization altered), in this industry and is thus suggestive.  On remand, the Board must consider all relevant evidence to determine whether Flex's marks are conceptually weak.

## III

With respect to commercial strength, Spireon argues that the Board again erred in declining to consider composite marks as to which there was evidence of use.  We agree.  Spireon also apparently argues that the existence of three identical marks should be considered in connection with commercial strength even though the record does not include evidence of use.  Third-party mark FLEX was registered in 1998 for goods including "computer software used for logistics management."  J.A. 1086.  Third-party mark FLEX was registered in 2013 for, among other things, "[c]omputer software platform for use in . . . managing supply chains."  J.A. 1092.  It was against this backdrop that Flex registered its own FLEX and FLEX (stylized) marks in 2016 and FLEX PULSE in 2017.  Subsequent to Flex's registrations, another third-party registered the mark FLeX for "[a]dvanced transportation controller for managing a variety of intelligent transportation systems, including traffic signal control and integration with connected or automated vehicles."  J.A. 1172.

It is well established that, in opposition proceedings, the burden of proof rests on the opposer.  *See Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 973 (Fed.

Cir. 2018).  In the likelihood of confusion analysis, "[t]he burden of establishing the strength of a mark falls on the trademark proprietor."  5 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 21:79 (4th ed. 2022); *see also Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1367 (Fed. Cir. 2012) (holding that it is the opposer's burden to prove fame of its mark).  While the applicant has a burden of producing evidence of relevant registrations, it may be that where the applicant has introduced evidence of third-party registrations, the burden should rest on the opposer to establish non-use rather than on applicants to establish use of those third-party registrations.  In other words, absent proof of non-use, use could be assumed.  Nonetheless, in prior cases, we and our predecessor court appear to have assumed, without explicitly stating, that in connection with the analysis of commercial strength, the burden rested on the applicant to establish that prior marks were actually in use.  *See, e.g.*, *AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 1406 (CCPA 1973) (holding that "little weight is to be given [to third-party] registrations in evaluating whether there is likelihood of confusion" because "[t]he existence of these registrations is not evidence of what happens in the market place or that customers are familiar with them").

Whether this is consistent with the overall burden of proof is an issue that we have not directly addressed, though the parties here[4] and this court in *Jack Wolfskin*,

---

[4]    *See* Appellant's Br. 24 (arguing that third-party registrations and uses represent a "[c]rowded [f]ield"); Oral Arg. at 20:20–58 ("The Court: What about the fact that there are three uses and registrations here that are virtually identical, they use the flex term standing alone? Appellee's Counsel: That is part of the, under the *Juice*

*see* 797 F.3d at 1373–74, appear to agree that registered marks may be considered in connection with commercial strength even where the opposer has produced no evidence of non-use.  We need not decide the broader question of which party bears the burden of establishing non-use as a general matter.  This case presents the far narrower question of whether the burden of showing non-use of identical marks for identical goods rests with the opposer.  We think it necessarily does.  Otherwise, the opposer would be able to dismiss the commercial significance of previously registered identical marks for identical goods where the opposer's own mark should perhaps have not been granted registration in the first place.  *See i.am.symbolic*, 866 F.3d at 1315 (affirming the examining attorney's refusal to register an identical mark for the same or similar goods); *see also* 15 U.S.C. § 1057(b) (providing that a certificate of registration is prima facie evidence of an owner's right to use the mark).

To be sure, even with respect to identical marks for identical goods, the marks will retain some measure of protection against a new registration for an identical mark for

---

*Generation* and *Jack Wolfskin* cases, those can be considered as evidence of third-party use that would weaken a mark.  But the *Juice Generation* and *Jack Wolfskin* cases are clear that, in order for third-party use to weaken a registered mark, there must be extensive, ubiquitous, voluminous, widespread use by third parties.").  Regardless of the parties' positions, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also Sanford's Est. v. Comm'r*, 308 U.S. 39, 51 (1939); *Forshey v. Principi*, 284 F.3d 1335, 1357 (Fed. Cir. 2002) (en banc).

14                                    SPIREON, INC. v. FLEX LTD.

identical goods. *See i.am.symbolic*, 866 F.3d at 1329. But that is not the situation here. Spireon's mark is not an identical mark for identical goods. Spireon seeks to register "FL FLEX" for different, albeit related, goods.

Here, Flex as opposer has failed to show that the identical marks for identical goods were not used in the marketplace, but on remand Flex should be given the opportunity to make such a showing, given our clarification of the applicable law.[5] If Flex fails to establish non-use, the commercial strength of the Flex marks must be considered weak as to Spireon's non-identical mark.

## IV

With regard to the FLEX PULSE mark, the Board erred in its analysis of the first *DuPont* factor by comparing FL FLEX to FLEX <u>PLUS</u> rather than the relevant mark, FLEX <u>PULSE</u>. This was more than a mere typographical error. The Board stated:

> We . . . find that the term "PLUS" in Opposer's FLEX PLUS mark is merely laudatory with respect to Opposer's identified products and services. As an adjective, "PLUS" is defined as "having, receiving, or being in addition to what is anticipated," "greater than that specified," or "possessing a specified quality to a high degree."

---

[5] The "last listed owner" of one of the third-party FLEX marks on the USPTO's Trademark Electronic Search System is United Parcel Service of America ("UPS"). J.A. 1086. While there is no record evidence of use of this mark in the present case, in the companion case, *Bad Elf, LLC v. Flex Ltd.*, there is evidence of UPS's use of the mark. *See* Joint Appendix at 1007–09, *Bad Elf, LLC v. Flex Ltd.*, No. 22-1839 (Fed. Cir. argued Apr. 4, 2023).

J.A. 68–69 (quoting *Plus*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/plus (last visited January 20, 2022)). Flex admits this was error, but asserts that the error is nonetheless harmless because the Board's overall similarity analysis is supported by substantial evidence. We disagree. We note that FLEX PULSE is quite different from FL FLEX in appearance and sound. "Flex" appears as the first word in the FLEX PULSE mark, while it is the last word in the FL FLEX mark. On remand, the Board should analyze the correct mark, taking into account all the differences between FL FLEX and FLEX PULSE.[6]

## CONCLUSION

The case is remanded to the Board to reconsider the likelihood of confusion and its ultimate decision sustaining the opposition in light of this opinion.

**VACATED AND REMANDED**

COSTS

Costs to Appellant.

---

[6] Spireon also argues that the Board erred in determining that the parties' goods and services are similar. We see no error in the Board's determination in this respect.