This Opinion Is A
Precedent Of The TTAB

Mailed: August 9, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Look Cycle International*

*v.*

*Kunshan Qiyue Outdoor Sports Goods Co., Ltd.*

_____

Cancellation No. 92079409

_____

Darren M. Geliebter, G. Mathew Lombard and Eric J. Huang of Lombard & Geliebter
    LLP for Look Cycle International.

John M. Murphy of BGAL Asociados, S.C.,
    for Kunshan Qiyue Outdoor Sports Goods Co., Ltd.[1]

_____

Before Kuhlke, English and Thurmon,
    Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Kunshan Qiyue Outdoor Sports Goods Co., Ltd. (Respondent) owns Registration

No. 6683483 on the Principal Register of the mark BLOOKE in standard characters

for:

> Bicycle brakes; Bicycle chains; Bicycle
> frames; Bicycle frames and bicycle handlebar grips; Bicycle

---

[1] John M. Murphy filed a notice of appearance and power of attorney for Respondent, 42
TTABVUE, prior to filing Respondent's brief. The correspondence address has been updated
to reflect that change.

> gears; Bicycle kickstands; Bicycle mudguards; Bicycle parts, namely, forks; Bicycle pedals; Bicycle seat posts; Bicycle tires; Bicycle water bottle cages; Bicycle wheel hubs; Bicycle wheel rims; Bicycles; Electric bicycles; Handle bars for bicycles; Pumps for bicycle tyres; Saddles for bicycles, in International Classes 12.[2]

Look Cycle International (Petitioner) has petitioned to cancel the Registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Respondent's mark so resembles Petitioner's previously used and registered LOOK and design and LOOK marks for, among other things, "bicycles, cycles and structural parts thereof" and "clothing," and previously used **LOOK** mark for bicycles, bicycle parts, and clothing, as to be likely to cause confusion when used in connection with Respondent's goods.[3] In addition, Petitioner seeks cancellation on the grounds of: 1) lack of bona fide use of the mark on the identified goods at the time Respondent filed the use-based application underlying the subject registration; and, 2) fraud, based on Respondent's lack of use in U.S. commerce of the mark on the identified

---

[2] The application that matured into Registration No. 6683483 was filed on April 7, 2021 under Section 1(a), 15 U.S.C. § 1051(a), based on allegations of first use and first use in commerce on January 23, 2021, and the registration issued on March 29, 2022.

[3] Pet. for Cancellation, 1 TTABVUE. When we cite to the record, we refer to TTABVUE, the Board's docketing system, by docket entry and page number of the downloaded document.

As part of an internal Board pilot citation program on broadening acceptable forms of legal citation in Board cases, the citation form in this opinion is in a form provided in the Trademark Trial and Appeal Board Manual of Procedure ("TBMP") 101.03 (2024). This opinion cites decisions of the U.S. Court of Appeals for the Federal Circuit and the U.S. Court of Customs and Patent Appeals only by the page(s) on which they appear in the Federal Reporter (e.g., F.2d, F.3d, or F.4th). For decisions of the Board, this opinion employs citation to the **Westlaw (WL)** database. Practitioners should also adhere to the practice set forth in TBMP § 101.03.

goods at the time it filed its use-based application.[4] By its answer, Respondent makes admissions that we address later in this opinion as pertinent to our analysis; Respondent otherwise denies the salient allegations.[5]

## I. Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), the file of the registration subject to the petition for cancellation. In addition, the record includes:

- Petitioner's Notice of Reliance on copies of Petitioner's pleaded registrations showing title and status;[6] excerpts from two third-party websites;[7] Respondent's responses to interrogatories and requests for admission;[8] Respondent's responses to requests for production;[9] excerpts from third-party websites showing use of Respondent's mark;[10] the file wrapper of Petitioner's Registration No.

---

[4] To the extent the petition for cancellation does not adequately plead fraud, fraud has been tried by implied consent pursuant to Fed. R. Civ. P. 15(b), and the petition is deemed amended to conform to the evidence. We construe the allegations regarding Respondent's lack of a bona fide intent as part of the fraud claim and not as forming the basis of an independent claim which would not be available here against an application based on use in commerce. In addition, the pleading includes claims based on dilution by blurring and tarnishment; however, these claims were not addressed in the briefs and are forfeited. *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.,* Cancellation No. 92050879, 2013 WL 5407315, at *2, *aff'd,* 565 F. App'x 900 (Fed. Cir. 2014) (mem.).

[5] Answer, 5 TTABVUE.

[6] 20 TTABVUE 1-36.

[7] *Id.* at 37-45.

[8] *Id.* at 46-90.

[9] *Id.* at 91-177. The responses to production submitted under various exhibits were authenticated by the responses to requests for admission nos. 1 and 2. Petitioner's Notice of Reliance, 20 TTABVUE 70; Trademark Rule 2.120(k)(3)(ii), 37 C.F.R. § 2.120(k)(3)(ii).

[10] *Id.* at 178-225.

4184746;[11] Respondent's responses to requests for production;[12] excerpts from USPS search results for addresses;[13] excerpts from Petitioner's and third-party websites;[14] excerpts from Opposition proceedings brought by Petitioner;[15] Respondent's discovery responses;[16] excerpts from online articles mentioning Petitioner's mark;[17] Respondent's responses to requests for production;[18] excerpts from third-party websites;[19]

- Petitioner's Testimony Affidavits, with exhibits, of Sébastien Coué (Coué Aff.), Petitioner's International Sales Manager,[20] and Eric Huang (Huang Aff.), Petitioner's outside counsel;[21]

- Respondent's Testimony Affidavit, with exhibits, of Dianyang Wen (Wen Aff.), Respondent's Director of Brand Operation and Deputy General Manager;[22] and

---

[11] *Id.* at 226-279.

[12] *Id.* at 280-322.

[13] *Id.* at 323-329.

[14] 21 TTABVUE 3-54.

[15] 22 TTABVUE 2-580.

[16] 25 TTABVUE 2-25.

[17] 33 TTABVUE 2-222.

[18] 36 TTABVUE 2-77.

[19] 37 TTABVUE 2-105.

[20] 27-32 TTABVUE (public); 26 TTABVUE (confidential).

[21] 34 TTABVUE.

[22] 38 TTABVUE.

4

- Petitioner's Rebuttal Notice of Reliance on Respondent's responses to requests for production.[23]

## II. Petitioner's Marks

Petitioner asserts rights in the following registered marks:

Registration No. 1570799 (filed November 18, 1987, issued December 12, 1989, renewed) for the mark (lined for the colors red, yellow, grey and blue) for "Cycles and structural parts thereof" in International Class 12;

Registration No. 4078387 (filed July 31, 1978, issued July 7, 1981, renewed) for the mark LOOK (typeset form) for "bags for tennis, and marine use, knapsacks, and backpacks" in International Class 28; and

Registration No. 4184746 (filed May 12, 2011, issued August 7, 2012, Section 71 declaration accepted) for the composite mark (colors red, yellow, gray, blue and black claimed as a feature of the mark) for "Clothing, namely, jerseys, leg warmers, arm warmers, t-shirts, rain coats, jackets, overalls, socks, vests and gloves; footwear excluding orthopedic footwear; headgear for wear, namely, hats, caps and visors; sports clothing, namely, bib shorts, cycling jerseys, cycling suits, parkas, sweaters, leg warmers, arm warmers, jerseys, t-shirts, jackets, rain coats, overalls, socks, vests, bicycling vests and gloves; sports footwear; all of the goods excluding those for winter sports" in International Class 25.

In addition, Petitioner asserts prior common law rights in the mark for bicycles, bicycle parts, and clothing.

---

[23] 39 TTABVUE 2-5.

## III.    Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action is a requirement that must be proven by the plaintiff in every inter partes case. *See Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1372 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). A party in the position of plaintiff may seek to cancel registration of a mark where such cancellation is within the zone of interests protected by the statute, and the party has a reasonable belief in damage that is proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303-05 (Fed. Cir. 2020).

Once a plaintiff has shown entitlement on one ground, it has the right to assert any other relevant ground in a cancellation proceeding. *See Poly-Am., L.P. v. Ill. Tool Works Inc.*, Cancellation No. 92056833, 2017 WL 4687981, at *4 (TTAB 2017) (if petitioner can show standing on the ground of functionality, it can assert any other grounds, including abandonment), *aff'd*, No. 3:18-cv-00443-C (N.D. Tex. Oct. 29, 2019); *Azeka Bldg. Corp. v. Azeka*, Opposition No. 91218679, 2017 WL 2391862, at *1 (TTAB 2017) (standing established based on surname claim sufficient to establish standing for any other ground).

As listed above, the record includes status and title copies of Petitioner's pleaded registrations that support a plausible likelihood of confusion claim. In view thereof, Petitioner's entitlement to a statutory cause of action to cancel Respondent's registration is established. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) (pleaded registrations "suffice to establish … direct commercial interest"; a belief in likely damage can be shown by establishing a direct commercial interest).

## IV.    Section 2(d) Claim

Section 2(d) of the Trademark Act prohibits the registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the [registrant], to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d).

To prevail on its Section 2(d) claim, Petitioner must prove, by a preponderance of the evidence, that it has priority in at least one of its pleaded LOOK and design, LOOK, or marks, and that Respondent's use of its BLOOKE mark in connection with the goods identified in its registration is likely to cause confusion, mistake, or deception as to the source or sponsorship of those goods. *Cunningham*, 222 F.3d at 946.

### A. Prior Proprietary Rights

Under Section 7(c) of the Trademark Act, 15 U.S.C. § 1057(c), a party may rely upon the filing date of the application underlying its registration for purposes of priority as its constructive use date. *See Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, Opposition No. 91188816, 2013 WL 4635990 at *5 (TTAB 2013); *Brewski Beer Co. v. Brewski Bros., Inc.*, Cancellation No. 92021735, 1998 WL 416757 at *4 (TTAB 1998).

The filing dates of the underlying applications of Petitioner's pleaded registrations for the LOOK and design and LOOK marks, precede the April 7, 2021 filing date of the underlying application of Respondent's subject registration (and Respondent's

asserted first use in January 2021, *see* Wen Aff. ¶ 10, 38 TTABVUE 123). In addition, Respondent admitted "[t]here is no issue of priority since the filing date of Respondent's aforementioned trademark application is subsequent to both the actual filing date of Petitioner's aforementioned registration and application, subsequent to Petitioner's date of first use, and Respondent has made no priority claim."[24]

Accordingly, Petitioner has established its priority of use against the subject registration for the marks and goods in its three pleaded registrations.

In addition, Petitioner has established its prior common law rights in the mark **LOOK** for bicycles, bicycle parts, and clothing beginning at least as early as 2010.[25]

B. Likelihood of Confusion

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours and Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (*DuPont*); *see also In re Guild Mortg. Co.,* 912 F.3d 1376, 1379 (Fed. Cir. 2019) (Board considers each relevant *DuPont* factor for which there is evidence and argument).

While we consider all of the pleaded registrations and proven common law uses, we focus our analysis on Petitioner's registered mark  for "cycles and

---

[24] Petition to Cancel ¶ 35, 1 TTABVUE 11; Answer ¶ 35, 5 TTABVUE 5.

[25] *See, e.g.*, Coué Aff. ¶¶ 32-49, Exhs. 7, 11, 12, 26 TTABVUE 12-480 (confidential), 27 TTABVUE 5-7 (¶ 33 "Petitioner began using the **LOOK** version of its mark around the world—including the United States—for cycles, cycle parts in Class 12 in 2010."), 29 TTABVUE 55-157, 30 TTABVUE 2-92.

structural parts therefor" and Petitioner's prior common law mark  for bicycles and bicycle parts ("LOOK marks"), because the goods are, in part, identical, legally identical and otherwise closely related to Respondent's identified goods, as discussed below. If we do not find a likelihood of confusion with respect to these marks and their goods, then there would be no likelihood of confusion with the marks and goods in Petitioner's other registrations. *See In re Max Cap. Grp. Ltd.*, Serial No. 77186166, 2010 WL 22358 at *2 (TTAB 2010).

1. Goods, Channels of Trade, Conditions of Sale

The "cycles" identified in Petitioner's Registration No. 1570799 for encompass Respondent's "bicycles," and Petitioner's identified structural parts for cycles encompass Respondent's various bicycle parts. Thus, the goods are legally identical in part. It is sufficient for a finding of likelihood of confusion if relatedness is established for any item encompassed by the identification of goods within a particular class in the registration. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 1336 (CCPA 1981); *Inter IKEA Sys. B.V. v. Akea, LLC*, Opposition No. 91196527, 2014 WL 1827031 at *12 (TTAB 2014).

Further, where, as here, the goods are in part legally identical as set forth in the parties' registrations and there are no limitations as to channels of trade or classes of purchasers in either Respondent's or Petitioner's registration, we must presume that Respondent's and Petitioner's identified goods will be sold in the same channels of trade and bought by the same classes of purchasers. *See In re Viterra Inc.,* 671 F.3d

9

1358, 1362 (Fed. Cir. 2012); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 1268 (Fed. Cir. 2002).

Petitioner has also established prior use of the mark **LOOK** in connection with bicycles and bicycle parts. An example of use of the **LOOK** mark on bicycles is shown below:[26]



Respondent's identification includes identical goods, bicycles, and related bicycle parts.[27] *Tuxedo*, 648 F.2d at 1336 (relatedness need only be established for any item in defendant's identification of goods in a particular class).

Petitioner's common law rights in its **LOOK** mark for bicycles and bicycle parts "are limited to the actual goods and channels of trade for which it uses its mark," *Hunter Indus., Inc. v. Toro Corp.*, Opposition No. 91203612, 2014 WL 1649332 (TTAB 2014), but "[t]here are no limitations as to channels of trade or classes of

---

[26] Coué Aff., Exh. 11, 29 TTABVUE 84 (photo of product in catalog).

[27] Coué Aff. ¶¶ 32-49, Exhs. 7, 11, 12, 26 TTABVUE 12-480 (confidential), 27 TTABVUE 5-7, 29 TTABVUE 55-157, 30 TTABVUE 2-92. We note Petitioner references a 2010 catalog as being Exhibit 11; however, the catalog under that Exhibit is dated 2019. Coué Aff., Exh. 11, 29 TTABVUE 56.

purchasers in the identification of goods in [Respondent's registration]," and it "therefore is presumed that [Respondent's] goods move in all channels of trade normal for those goods, and that they are available to all classes of purchasers for those goods." *Id.* Petitioner offers its goods "through Petitioner's vast network of dealers via their online and retail stores, and also on Amazon. Petitioner's distribution network includes bike specialty stores, including brick and mortar and online only stores. … Petitioner's LOOK-branded products are also available at [third-party websites]."[28] These trade channels overlap with Respondent's presumed and actual trade channels ("Walmart and online at Amazon.com and various other websites").[29]

As to the conditions of sale, the record reveals that the goods are "targeted to and purchased by consumers of all ages and demographics who use bicycles and bicycle parts, including cyclists of all levels of skill and sophistication."[30] We must make our determination based on the least sophisticated consumer. *Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1325 (Fed. Cir. 2014). We find these broadly-identified goods, encompassing inexpensive and basic bicycles and parts, by their nature would not be subject to a high degree of impulse purchasing; moreover, given the relatively low cost of many bicycle parts and the broad range of potential consumers, the purchasing process overall does not uniformly involve a high level of care.

---

[28] Coué Aff. ¶¶ 43-44, 27 TTABVUE 6.

[29] Wen Aff. ¶ 14, 38 TTABVUE 124.

[30] Coué Aff. ¶ 54, 27 TTABVUE 7.

11

The in part identical nature of the goods, channels of trade, and classes of consumers weigh heavily in favor of likelihood of confusion, but the conditions of sale are neutral.

## 1. Strength of Petitioner's LOOK Marks

Before we compare the marks, we consider the strength or weakness of Petitioner's marks. When evaluating the strength, we look at the marks' inherent strength based on the nature of each mark and the marks' commercial strength in the marketplace, *Spireon Inc. v. Flex Ltd.*, 71 F.4th 1355, 1362 (Fed. Cir. 2023) (citing *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353 (Fed. Cir. 2010) (measuring both conceptual and marketplace strength)), as well as "[t]he number and nature of similar marks in use on similar goods." *Made in Nature, LLC v. Pharmavite LLC*, Opposition No. 91223352, 2022 WL 2188890 at *11 (quoting *DuPont*, 476 F.2d at 1361). Commercial strength or fame of a mark is not a binary "all-or-nothing" factor in the context of a likelihood of confusion analysis. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017). Rather, likelihood of confusion fame "varies along a spectrum from very strong to very weak." *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1375 (Fed. Cir. 2005) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 1344 (Fed. Cir. 2003)).

As Petitioner argues, LOOK "has no meaning in connection with Petitioner's goods, namely 'cycles and structural parts thereof'" (Petitioner's brief, 41 TTABVUE

41), and is inherently distinctive. We find the LOOK marks (both the stylized word and word and design marks) are inherently distinctive.

In support of its argument that its marks are commercially strong, Petitioner recites the following facts as demonstrated by the evidence:

- Petitioner has been using its LOOK and design mark in the United States for nearly 40 years beginning in 1985 with its clipless pedals (Coué Aff. ¶ 22, 27 TTABVUE 4);

- Petitioner's sales for bicycles, bicycle parts and clothing in the United States have been substantial both in volume and revenue (*Id.* ¶¶ 48-50, 26 TTABVUE 6 (confidential); 27 TTABVUE 6 (public));

- Petitioner's advertising expenditures have also been substantial but these are global figures that include the United States (*Id.* ¶¶ 56, 61, 26 TTABVUE 6-7; 27 TTABVUE 6-7);

- Petitioner advertises its LOOK products on its website and social media platforms: Facebook 279,000 followers; Instagram 230,000 followers; and YouTube 10,400 subscribers (*Id.* ¶¶ 74-75, 27 TTABVUE 9, *Id.* Exh. 16, 30 TTABVUE 260-343);

- Petitioner sponsors cyclists (individuals and teams) in international competitions (e.g., Tour de France, Olympics) and its LOOK marks are prominently displayed with wide consumer exposure both via television and in person. (*Id.* ¶¶ 59-68, 27 TTABVUE 8-9; Exhs. 8, 9, 10, 29 TTABVUE 11-54; Exh. 15, 30 TTABVUE 230-251);

- Petitioner's LOOK marks receive unsolicited media coverage in print and online and include "coverage of Petitioner's product releases, such as the latest bicycle models and technological innovations, as well as a profile of what bicycle brands athletes are using in competitions .. [and this] media coverage has also given Petitioner's goods bearing the LOOK marks, particularly its bikes and its clipless pedals, rave reviews and rated them as recommended buys and at the top of best-of lists." (*Id.* ¶¶ 76-78, 27 TTABVUE 9-10; Exh. 17, 32 TTABVUE 2-257; Petitioner's Notice of Reliance Exh. 12, 33 TTABVUE 4-222);

- Petitioner's goods bearing the LOOK marks have won numerous awards (*Id.* ¶¶ 79-81, 27 TTABVUE 10; Exhs. 17-18, 31 TTABVUE 413-437; 32 TTABVUE 6); and

- Petitioner has engaged in enforcement actions to maintain its exclusive use of the term LOOK in connection with bicycles and bicycle parts and accessories. (*Id.* ¶¶ 84-85, 27 TTABVUE 11; Petitioner's Notice of Reliance, 22 TTABVUE 2-580).

There is no evidence to place the sales and advertising amounts in context within the industry, rendering the figures less persuasive. *Bose Corp. v. QSC Audio Prods., Inc.,* 293 F.3d 1367, 1375 (Fed. Cir. 2002) ("Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading…. Consequently, some context in which to place raw statistics is reasonable."); *Mini Melts, Inc. v. Reckitt Benckiser LLC*, Opp. No. 91173963, 2016 WL 3915987 at *19 (TTAB 2016) (probative value of sales revenue figures diminished by the fact that the amount was a raw number without context as to market share or whether the amount was significant in the industry). In addition, the advertising expenditures are for global spending not just the United States, which is our point of reference for the perception of U.S. consumers. *New Era Cap Co., Inc. v. Pro Era, LLC*, Opp. No. 91216455, 2020 WL 2853282, at *13 (TTAB 2020) ("Because Opposer failed to break down sales and expenditures for the United States alone, the probative value of this evidence to prove commercial strength or fame is diminished.").

Along the same lines, with regard to the media references, sponsorships, and awards, much of that occurs outside of the United States. Some evidence is in French and presumably the matter to which it refers (awards) did not occur in the United States, rendering it irrelevant to our inquiry. *See, e.g., Int'l Dairy Foods Assoc'n v.*

14

*Interprofession du Gruyère*, Opp. No. 91232427, 2020 WL 4559436, at *8 (TTAB 2020) (nonconforming evidence consisting of documents in whole or in part in a foreign language without an English translation and materials bearing web addresses without a copy of the corresponding web pages not considered by the Board), *aff'd*, 575 F. Supp. 3d 627 (E.D. Va. 2021), *aff'd*, 61 F.4th 407 (4th Cir. 2023).

We agree with Respondent, that while LOOK bicycles and bicycle parts have some renown with bicycle enthusiasts, this is a small portion of the relevant consumers. The social media followers and subscribers are not overwhelming, which may reflect the somewhat higher level of commercial strength among enthusiasts versus the somewhat lower level among other bicycle consumers. Conversely, Respondent did not provide evidence of third-party uses and registrations to constrict the scope of protection.

This record does not support a finding that Petitioner's mark falls on the higher end of the fame or commercial strength spectrum but it does show that it has achieved overall a somewhat heightened level of commercial strength among more serious bicycle consumers. In view of the above, we accord Petitioner's marks a slightly broad scope of protection for bicycles and bicycle parts to account for that group of bicycle consumers and this weighs slightly in favor of likely confusion.

2. Similarity of the Marks

Turning to the issue of the similarity or dissimilarity of the marks, we compare them in their entireties as to appearance, sound, connotation and commercial impression. *DuPont*, 476 F.2d at 1361; *see also Palm Bay*, 396 F.3d at 1371.

15

"Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, Ser. No. 87075988, 2018 WL 2734893, at *5 (TTAB 2018) (quoting *In re Davia*, Ser. No. 85497617, 2014 WL 2531200, *2 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019); *accord Krim-Ko Corp. v. Coca-Cola Bottling Co.*, 390 F.2d 728, 732 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (citation omitted).

In comparing the marks, we are mindful that where, as here, the goods are in part identical, the degree of similarity necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the goods. *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1368 (Fed. Cir. 2012; *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 1373 (Fed. Cir. 2018) (quoting *Coach Servs.*, 668 F.3d at 1368); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1053 (Fed. Cir. 2012).

As discussed above, we focus on Petitioner's common law mark  and registration for the composite LOOK and design mark.,  . With regard to Petitioner's registered mark  , the word LOOK is the dominant

16

portion. Where a mark comprises both wording and a design, greater weight is often given to the wording, because it is the wording that purchasers would use to refer to or request the goods or services. *See, e.g.*, *Viterra*, 671 F.3d at 1362. The Court of Appeals for the Federal Circuit has cautioned, however, that "[t]here is no general rule as to whether letters or designs will dominate in composite marks; nor is the dominance of letters or design dispositive of the issue." *In re Electrolyte Labs. Inc.*, 929 F.2d 645, 647 (Fed. Cir. 1990). Here, because LOOK appears in large, bold font, and the design elements merely consist of geometric patterned blocks that make less of an impression, LOOK stands out as the focus of the mark.

Respondent's mark incorporates the entirety of the literal portion of Petitioner's LOOK marks. While BLOOKE may be a coined term, the word LOOK is apparent in the mark in particular when appearing on the product as shown below:[31]

---

[31] Wen Aff. Exh. 1b, 38 TTABVUE 25.



The marks, therefore, are similar in appearance. Respondent's argument that its mark is registered in standard characters, and thus "the manner of its actual use is irrelevant," is misplaced. The rights associated with a standard character mark reside in its wording, and not in any particular display and we must consider that Respondent's mark may be displayed in the same font, color and size that Petitioner uses in its marks. *Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1353 (Fed. Cir. 2011); TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1207.01(c)(iii) (May 2024). Thus, although the design element in one of Petitioner's marks is a difference, we must consider Respondent's mark in the stylization used in both of Petitioner's marks. Moreover, while it is frequently the case that the first word or term of a mark is more prominent and likely to be remembered, *Palm Bay*, 396 F.3d at 1372, that is not the case here, with simply the first letter B. *Compare In re*

*Detroit Athletic Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly significant because consumers typically notice those words first."); *Palm Bay*, 396 F.3d at 1372 ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark) (emphasis added). Again, in view of the standard characters, we consider possible displays that emphasize the common element LOOK such as bLOOKe or BLOOKE.

Considering the sound of the marks, we acknowledge that there is not necessarily one correct pronunciation of a trademark that is not a recognized word. "[I]t is impossible to predict how the public will pronounce a particular mark." *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 2010 WL 1514315, at *11 (TTAB 2010). Absent evidence to the contrary, we must consider all reasonable possibilities. *See StonCor Grp., Inc. v. Specialty Coatings, Inc.*, 759 F.3d 1327, 1332 (Fed. Cir. 2014) ("Where a trademark is not a recognized word and the weight of the evidence suggests that potential consumers would pronounce the mark in a particular way, it is error for the Board to ignore this evidence entirely and supply its own pronunciation."). Petitioner's mark contains the word LOOK which has a known pronunciation. Respondent's mark is a made-up word and has no established pronunciation. However, Respondent's mark can be pronounced in a manner that rhymes with Petitioner's LOOK marks. As Petitioner asserts, the double OO is generally pronounced in that way, e.g., BOOK, HOOK, COOK, NOOK, ROOK, TOOK. *See* Petitioner's brief, 41 TTABVUE 32. The addition of the E at the end of the word does not change this, as it generally would be silent, as demonstrated by the surnames

19

COOKE, HOOKE and BROOKE. *Id.* A significant segment of consumers will pronounce Respondent's mark as rhyming with Petitioner's mark. Thus, we find that the marks rhyme which presents a similarity in sound.

As to connotation, the coined term would have no meaning, but could evoke the word LOOK when that word is perceived by consumers as embedded within BLOOKE. We find these similarities overall point to similar commercial impressions.

The similarity of the marks weighs in favor of likely confusion.

## 3. Intent

Bad faith adoption or intent to confuse falls under the thirteenth *DuPont* factor, "any other established fact probative of the effect of use." *L.C. Licensing Inc. v. Berman*, 2008 WL 835278, at *8 (TTAB 2008); *see also Quicktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1036 (Fed. Cir. 2021). Establishing bad faith requires a showing that the defendant intentionally sought to trade on the plaintiff's goodwill or reputation. *See Big Blue Prods. Inc. v. Int'l Bus. Machs. Corp.*, 1991 WL 326549, at *4 (TTAB 1991).

Petitioner asserts that:

> Respondent (1) adopted a mark that is visually similar to Petitioner's marks, (2) adopted a mark that is phonetically similar to Petitioner's marks, (3) for identical and very similar goods, and (4) by its own evidence, uses the mark in a manner similar to the way Petitioner's mark has been used for years, namely, in all capital letters, in a sans-serif font, in a "heavy" type, and with a rightward slant. Moreover, Respondent has not submitted any evidence to explain the creation, selection and use of BLOOKE that establishes it did not simply intentionally copy Petitioner's LOOK Marks.

Petitioner's brief, 41 TTABVUE 45-46.

Mere knowledge of the existence of a prior user's mark does not, by itself, constitute bad faith. *Quicktrip*, 984 F.3d at 1036; *Action Temporary Servs. Inc. v. Labor Force Inc.,* 870 F.2d 1563*,* 1566 (Fed. Cir. 1989). There must be evidence of an intent to confuse. *See Quicktrip*, 984 F.3d at 1036 (citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 117 (2d Cir. 2009)). We find the limited evidence regarding the manner of use and absence of testimony to explain the creation of Respondent's mark insufficient to make a finding of bad faith in this case.

This factor is neutral.

4.  Balancing the Factors

We have found that the parties' goods are identical and legally identical, and their channels of trade and classes of consumers overlap; these factors weigh heavily in favor of likely confusion. In addition, the marks are similar, favoring likely confusion. We have found the conditions of sale and intent to be neutral in our analysis. While we have accorded Petitioner's mark a slightly heightened scope of protection among some consumers, even if the scope were narrower, the other factors would still outweigh the narrower scope and result in likely confusion. Considering the record evidence as a whole, we find that Petitioner has carried its burden to establish by a preponderance of the evidence that Respondent's mark BLOOKE is likely to cause consumer confusion with Petitioner's LOOK marks. The petition is granted on the Section 2(d) claim.

21

## V. Lack of Bona Fide Use

An application based on use of the mark in commerce under Section 1(a), as in this case, is void ab initio if the mark was not in use in commerce in connection with the goods identified in the application at the time the application was filed. *See* 15 U.S.C. § 1051(a); Trademark Rule 2.34(a)(1)(i), 37 C.F.R. § 2.34(a)(1)(i). *See also, Aycock Eng'g Inc. v. Airflite Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) (registration of a mark that does not meet the use requirement is void ab initio); *Toys, Inc. v. McDonald's Corp.*, 585 F.2d 1067, 1068 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application was void); *Clorox Co. v. Salazar*, 2013 WL 5498171, at *4-5 (TTAB 2013) (applicant's mark not in use in commerce as of the filing date of the use-based application).

Under Section 45 of the Trademark Act, "use in commerce" for goods is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Section 45 goes on to state that a mark shall be deemed to be in use in commerce on goods when it is placed on the goods, or their containers or displays associated therewith, or on documents associated with the goods or their sale, and the goods are "sold or transported in commerce." *Id.*

Petitioner asserts that Respondent did not use its mark in connection with the identified goods in the United States on or before the filing date of the underlying application. Petitioner's brief, 41 TTABVUE 47. In support of its position, Petitioner provides evidence that undermines all examples of use Respondent provided during discovery and as a specimen of use in support of its underlying application. Petitioner

addresses the documents offered in discovery in four categories: 1) product orders from Aliexpress.com; 2) product orders from Amazon.com; 3) photographs from a trade show; and 4) a document titled "Proof of First Use" that is a copy of Respondent's specimen of use. *Id.*

Petitioner argues that the Aliexpress.com orders, while they purport to show orders for BLOOKE goods placed before April 7, 2021, are for goods that are not covered by Respondent's registration. Petitioner's brief, 41 TTABVUE 47. Specifically, the goods listed on the orders are "bottom bracket" and "headset" which are not listed in Respondent's identification of goods. According to Petitioner, the bottom bracket on a bicycle connects the crankset to the bicycle; it is not part of the crankset itself. The headset provides a rotatable interface between the bicycle fork and the head tube of a bicycle frame, it is not part of the fork itself. Petitioner's brief, 41 TTABVUE 47-48; Petitioner's Notice of Reliance, 37 TTABVUE 79-99 (Wikipedia excerpts).

Respondent's identification of goods includes bicycle cranks, bicycle frames and bicycle forks. Respondent argues it is not always true that a bracket is not part of a crankset asserting "[t]he Wikipedia article cited by Petitioner refers to one-piece 'Ashtabula' brackets that are integrated with the spindle and crank arms of the crankset [and a Wikipedia article also refers to ] 'integrated headsets,' where the headset is integrated with the head tube, which is part of the bicycle frame." Respondent's brief, 43 TTABVUE 16. Whether or not a bottom bracket and a headset may form part of a complete crankset or fork, the orders are for the individual bottom

23

bracket and headsets, not for cranksets containing bottom brackets or forks containing a headset. Respondent's identification does not include bottom brackets or headsets separately (or even bottom brackets sold as part of cranksets or headsets sold as part of forks); therefore, these orders do not support use for any of Respondent's identified goods.

Turning to the Amazon.com product orders, Petitioner points out that the dates on the face of the documents are after the April 7, 2021 filing date except for two documents that display a different mark.

The third category of documents provided by Respondent in discovery consist of pictures of a trade show that Respondent in an email described as "USA exhibition scene pictures." Petitioner's brief, 41 TTABVUE 49; Huang Aff. ¶ 3, Exh. 1, 34 TTABVUE 2-18; Petitioner's Notice of Reliance, Exh. 13-D, 36 TTABVUE 44-77. The picture from the trade show described by Respondent as a "USA exhibition scene picture," although somewhat blurred, shows the attendance tag for a CHINA CYCLE 2023 event which was advertised as being in Shanghai China.[32]

---

[32] Respondent has not rebutted Petitioner's evidence presented with regard to this event.





To rebut Petitioner's showing of nonuse, and to show use prior to its April 7, 2021 filing date, Respondent relies on the following Wen testimony:

> Respondent's first use of BLOOKE in class 12 in United States commerce occurred in January 2021 (Wen Aff. ¶ 10, 38 TTABVUE 123);

> Since at least as early as January 2021, Respondent's goods bearing the BLOOKE mark have been available for purchase and sold at Walmart and online at Amazon.com

---

[33] Petitioner's Notice of Reliance Exh. 13-D, 36 TTABVUE 46 (document produced by Respondent and admitted as authentic Petitioner's Notice of Reliance Exh. 3-B, 20 TTABVUE 71 (response to admission request no. 1).

[34] Petitioner's Notice of Reliance Exh. 14, 37 TTABVUE 101 (https://topeparts.com/china-cycle-2023-a-preview-of-the-leading-trade-show-in-china).

and various other websites. (*Id.* ¶ 14, 38 TTABVUE 123); and

Attached hereto as EXHIBIT 2 are copies from Respondent's corporate records of product orders on Aliexpress.com for class 12 goods bearing the BLOOKE mark to customers in the United States dated as early as October 2020. These product orders are kept in the usual course of Respondent's business, and are maintained for purposes of order fulfilment and tax reporting. (*Id.* ¶ 15, 38 TTABVUE 123).

The testimony attests to use of BLOOKE on "goods" and "[C]lass 12 goods" in the United States, but does not specify which goods in Class 12. The testimony also refers to goods bearing the BLOOKE mark available for purchase and sold at Walmart and Amazon as early as January 2021, but again does not specify which goods. Exhibit 2 consists of orders for certain goods (bottom bracket, headsets) via Aliexpress.com. but, discussed above, Petitioner has shown these goods are not encompassed by the goods listed in Respondent's identification of goods.

Finally, the "Proof of First Use" document in the fourth category is Respondent's specimen of use. The "[s]pecimens in the file of an application for registration, or in the file of a registration, are not evidence on behalf of the applicant or registrant unless identified and introduced in evidence as exhibits during the period for the taking of testimony. ... Establishing the truth of these or any other matters asserted in the files of these applications and registrations shall be governed by the Federal Rules of Evidence, the relevant provisions of the Federal Rules of Civil Procedure, the relevant provisions of Title 28 of the United States Code, and the provisions of this part." Trademark Rule 2.122(b)(2), 37 C.F.R. § 2.122(b)(2).

Respondent simply asserts that "Registrant's use is further corroborated by the specimens of use submitted with its application." Respondent's brief, 43 TTABVUE 14. Respondent has not provided any evidence to establish those specimens of use are accurate and do in fact demonstrate sales to consumers in the United States. In fact, Respondent did not submit orders for the goods displayed in the specimens of use to show use on the identified goods by the April 7, 2021 filing. During prosecution of the registration Respondent submitted pictures of goods with its mark and invoices to demonstrate sales of those products, reproduced below:[35]



---

[35] Specimen of Use Registration No. 6683483.

We first observe that the website specimen and invoices reference "pumps for bicycle tyres" employing the British spelling for tires.[36] Petitioner provided unrebutted evidence that the U.S. recipient addresses listed on the invoices offered as part of the specimen submission do not exist. Specifically, Petitioner provided

---

[36] COLLINS DICTIONARY, https://www.collinsdictionary.com ("tyre in British English or US tire Noun 1. A rubber ring placed over the rim of a wheel of a road vehicle to provide traction and reduce road shocks, esp. a hollow inflated ring (pneumatic tyre) consisting of a reinforced outer casing enclosing an inner tube"). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or regular fixed editions. *In re Cordua Rests. LP*, 2014 WL 1390504, at *2 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594 (Fed. Cir. 2016).

28

search results from the United States Postal Service (USPS) website for each address. One example is reproduced below:[37]

The invoices have been demonstrated to be false, and Respondent has proffered nothing to rebut the evidence that the invoices are false or to establish the goods in the specimens were sold under the BLOOKE mark in the United States as of April 7, 2021. In fact, Respondent pointedly did not offer any evidence to establish use of those specific goods prior to the filing date, but rather only offered evidence regarding asserted sales of bottom brackets and headsets.

---

[37] Petitioner's Notice of Reliance, 20 TTABVUE 326 (printout from official USPS website https://tools.usps.com).

Respondent is correct that use may be proven by witness testimony that is clear, consistent and uncontradicted. But here the testimony is not clear, it does not attest to any of the specific goods listed in the registration, just the class, and is inconsistent with and contradicted by the documentation Respondent submitted with its specimens of use. Petitioner demonstrated this by showing the ghost addresses, and the documentation submitted with the testimony, the aliexpress.com orders, showing orders for goods not listed in the registration or shown in the specimens of use. Respondent is also correct that it is Petitioner's burden to prove its claim of no use prior to the application filing date, which Petitioner has done by showing the infirmity of the specimens of use, and Respondent did not rebut Petitioner's showing with evidence to show actual sales of the identified goods prior to April 7, 2021.

In short, the evidence relied on by Respondent to rebut Petitioner's showing of no use prior to the filing date does not rebut Petitioner's showing. In view thereof, the petition for cancellation is granted on the ground of lack of bona fide use of the mark in commerce for the identified goods prior to the filing of the underlying use-based application.

## VI.  Fraud

Fraud in procuring or maintaining a trademark registration occurs when an applicant for registration, or a registrant in a post-registration submission, knowingly makes a false, material representation of fact in connection with an application to register, or a post registration maintenance document, with the intent of obtaining or maintaining a registration to which it is otherwise not entitled. *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Torres v. Cantine Torresella S.r.l.*,

808 F.2d 46, 48 (Fed. Cir. 1986); *Embarcadero Techs., Inc. v. Delphix Corp.*, Opp. No. 91197762, 2016 WL 462869, at *4 (TTAB 2016). "[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." *Bose*, 580 F.3d at 1245 (cleaned up); *accord In re Cohn*, 54 F.3d 1108, 1118 (3d Cir. 1995) ("[A] debtor will rarely, if ever, admit that deception was his purpose."). In addition, the Board has held that intent to deceive can be inferred from recklessness, in particular a reckless disregard for the truth. *Chutter, Inc. v. Great Mgmt. Grp., LLC*, Opp. No. 91223018, 2021 WL 4494251, at *6 (TTAB 2021) (Board held as a matter of law that reckless disregard satisfies the requisite intent for fraud on the USPTO in trademark matters), *reversed on other grounds sub nom. Great Concepts, LLC v. Chutter, Inc.*, 90 F.4th 1333 (Fed. Cir. 2023); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."); *Cohn*, 54 F.3d at 1118-19 ("Thus, we join with other courts, including the Courts of Appeals for the Sixth, Tenth, and Eleventh Circuits, in holding that the intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth."); *cf. In re Bose*, 580 F.3d at 1246 n.2 (question whether reckless disregard of the truth or falsity of a material statement made in a filing with the USPTO satisfies the intent to deceive requirement left open).

A party alleging fraud in the procurement or maintenance of a registration bears the heavy burden of proving fraud with clear and convincing evidence. *In re Bose*, 580

F.3d at 1243 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 1981 WL 48127, at *7 (TTAB 1981)). For example, the Board will not find fraud if the evidence shows that a false statement was made with a reasonable and honest belief that it was true, rather than an intent to mislead the USPTO into issuing a registration to which the applicant was not otherwise entitled. *See id.*; *see also Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*, 1997 WL 440268, at *3 (TTAB 1997), *aff'd*, 152 F.3d 942 (Fed. Cir. 1998) (table).

Petitioner sets out its basis for the fraud claim as follows:[38]

> Respondent knowingly made at least two false, material statements to the USPTO with the intent to deceive, for purposes of obtaining the '483 Registration. First, Respondent submitted a specimen with its application indicating that it had used the BLOOKE mark in commerce "on or in connection with…Pumps for bicycle tyres" – when it actually had not. As previously discussed above with respect to nonuse, the final page of the specimen contained three purported transactions, which were intended to identify alleged sales of products bearing Respondent's mark. The transactions purport to show purchase dates in February 2021, prior to the filing date [of the application], with shipment addresses to three purchasers. However, none of these addresses actually exist – they are non-existent locations.
>
> Second, following directly from the specimen containing falsified evidence of use, Respondent submitted a false declaration ….
>
> Because the specimen states that Respondent made three sales of goods bearing the BLOOKE mark prior to the filing date, when it did not – because those addresses do not exist—this statement on the specimen is both false and material. Likewise, Respondent's declaration that it was using the mark in commerce, when it was not, was also false and material. Had the trademark examining attorney

---

[38] Petitioner's brief, 41 TTABVUE 51-53.

> known that Respondent was not using the BLOOKE mark as of the filing date, registration appropriately should have been refused.

Respondent argues:[39]

> As noted above, Petitioner has not met its burden of proving that the mark BLOOKE was not in use when the application was filed. There is uncontroverted testimony and documentary evidence that Registrant was using the mark BLOOKE in the United States when it filed the application.

Respondent further notes that it "disagrees that multiple mistakes are implausible" and that "[t]he specimen of use cannot be the basis for a fraud claim" because "[e]ven if Petitioner is correct in claiming that the addresses listed in the specimen of use do not exist, there was no material misrepresentation (as required in fraud claims), because the Examining Attorney did not rely on the accuracy of the addresses in deciding whether to grant registration."[40]

We find the facts of this case demonstrate knowing intentional deception. However, even if the evidence were not sufficient to reveal such intention directly, at a minimum, the facts of this case demonstrate reckless disregard for the truth from which we infer the requisite intent. *See Chutter*, Opp. No. 91223018, 2021 WL 4494251, at *6 (TTAB 2021), *reversed on other grounds sub nom. Great Concepts, LLC v. Chutter, Inc.*, 90 F.4th 1333 (Fed. Cir. 2023).

Respondent does not dispute that the addresses submitted as part of the specimens of use are false, and the evidence demonstrating their falsity stands

---

[39] Respondent's brief, 43 TTABVUE 17.

[40] Respondent's brief, 43 TTABVUE 17 fn. 3, 4.

unrebutted. In fact, the evidence submitted by Respondent, vague statements about "class 12" goods, showing use on other goods, and notably not showing use on "pumps for bicycle tyres" prior to April 7, 2021, support the finding that Respondent did not sell the "pumps for bicycle tyres" displayed in the specimens of use in the United States prior to April 7, 2021. As discussed above, everything submitted by Respondent further supports that Respondent did not sell the "pumps for bicycle tyres" displayed in the specimens of use in the United States prior to April 7, 2021.[41] We therefore find the specimens of use are false in that they do not show use in the United States.

The falsity of the specimens is a material misrepresentation, as they must be accepted by the Examining Attorney to demonstrate use in commerce for a Section 1(a) use-based application before being passed to publication and eventual registration. 15 U.S.C. § 1051(a)(1); 37 C.F.R. § 2.56. As explained in *Nationstar Mort. LLC v. Ahmad*, Opp. No. 91177036, 2014 WL 6480655, at *4 (TTAB 2014):

> Applicant's statements (and specimens) regarding his use of the NATIONSTAR mark for the identified services as of the application's filing date certainly were material to the examining attorney's approval of the application for publication. Averments and evidence of use of a mark for the goods or services identified in a use-based application are critical to the approval of a use-based application, and if it had been disclosed to the examining attorney that the mark was not in use for the identified services (or that the specimen of use was fabricated), registration would have been refused. Materiality having been established, we

---

[41] With regard to Respondent's footnoted assertion that the Examining Attorney did not rely on the accuracy of the addresses, whether or not the Examining Attorney relied on the false addresses is not the point, the Examining Attorney must rely on the specimens of use to pass the application to registration and the specimens have been demonstrated to be false.

> must determine whether the testimony and evidence of record clearly shows that applicant's representations to the Office were false and knowingly made with the requisite intent to deceive the USPTO.

Further, we infer from the evidence comprising: 1) non-existent addresses shown on the specimens of use during prosecution of the application, 2) the absence of testimony or evidence regarding use of the "pumps for bicycle tyres" displayed in the specimens of use, and 3) the proffer of documents during discovery asserted as showing an event held prior to April in 2021 in the United States but demonstrated to be from 2023 for an event in Shanghai China, that Respondent acted with intentional deception.

In the alternative, Respondent acted with reckless disregard as to the truth of matters asserted in its application. An applicant is charged with knowing the specimen submitted to support its averment of use in the United States in fact shows just that, and that the displayed goods have in fact been sold in the United States, and by submitting a specimen of use displaying goods shown to have not been sold in the United States, as demonstrated by the false addresses and the lack of testimony or evidence to show such use, Respondent acted with a reckless disregard for the truth. *Chutter*, 2021 WL 4494251, at *13. To find otherwise could encourage applicants to conclude that such reckless disregard carries no consequence and they can submit false material representations without penalty. *Id.*

In sum, Respondent's specimen which contains false addresses constitutes a false material representation of fact with the intent to deceive the USPTO.

In addition, Respondent submitted a declaration signed on its behalf by its attorney, whose actions are imputed to Respondent. *See Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962); *see also Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partn.,* 507 U.S. 380, 397 (1993); 37 C.F.R. 2.193(e)(1) (stating that an attorney may sign a verified statement in support of an application "on behalf of the owner.") In doing so, Respondent knowingly made false misrepresentations when signing the declaration supporting the underlying application that includes the following statements:[42]

> The mark is in use in commerce and was in use in commerce as of the filing date of the application on or in connection with the goods/services in the application;
>
> The specimen(s) shows the mark as used on or in connection with the goods/services in the application and was used on or in connection with the goods/services in the application as of the application filing date;
>
> To the best of the signatory's knowledge and belief, the facts recited in the application are accurate;
>
> To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.
>
> The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

---

[42] Application Serial No. 90628580 p. 1.

Again, based on the record in this case, the statements in this declaration have been shown to be false, constitute material representations, and were signed by Respondent's attorney on behalf of Respondent. In view of the evidence in this case, we find this constitutes intentional deception, or at a minimum, reckless disregard for the truth from which we infer intent to deceive. In sum, Respondent submitted the application declaration containing false material representations of fact with the intent to deceive the USPTO.

In view thereof, the petition is granted on the ground of fraud.

**DECISION:** The petition to cancel is granted on all three grounds.