UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500
General Email: TTABInfo@uspto.gov

WBC

Original Decision Mailed: November 14, 2025
Redesignation Mailed: January 27, 2026

UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*August Storck KG*
*v.*
*Florend Indústria e Comércio de Chocolates LTDA*

____

Opposition No. 91277224

____

**By the Trademark Trial and Appeal Board**:

The Board has chosen to redesignate the decision issued on November 14, 2025 in this proceeding as a precedent. A copy of the decision, bearing the precedential designation, is attached.

Mailed: November 14, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*August Storck KG*
*v.*
*Florend Indústria e Comércio de Chocolates LTDA*
_____

Opposition No. 91277224
_____

Joseph F. Schmidt of Taft Stettinius & Hollister LLP,
    for August Storck KG.

Samuel F. Pamias of Hoglund & Pamias, PSC,
     for Florend Indústria e Comércio de Chocolates LTDA.

_____

Before Lykos, English and Cohen,
    Administrative Trademark Judges.

Opinion by Cohen, Administrative Trademark Judge:

Applicant, Florend Indústria e Comércio de Chocolates LTDA, seeks registration

on the Principal Register of the stylized mark **DANKE** for "chocolate; chocolate

bars" in International Class 30 (the "Application").[1] The Application includes a

---

[1] Application Serial No. 90605879 was filed on March 26, 2021 under Section 1(b) of the
Trademark Act, 15 U.S.C. § 1051(b), based on an allegation of intent to use the mark in
commerce. The application claims the colors brown and beige as features of the mark. The

statement that the English translation of "danke" is "thank you."

In its amended pleading, August Storck KG opposes registration of Applicant's mark on the ground of likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), based on alleged prior common law use of the marks MERCI, THANK YOU MEANS MERCI, DANKE HEIßT MERCI, and other MERCI marks for chocolate bars and candies,[2] as well as ownership of Principal Register registrations for the following marks for goods all in International Class 30:

-  for "chocolate, and candies";[3]

- MERCI (typeset) for "chocolate and chocolates";[4]

- THANK YOU MEANS MERCI (standard characters) for "chocolate; chocolate products, namely, chocolate pralines, chocolate bars";[5]

- MERCI FINEST MOMENTS (standard characters) for "confectionery made of sugar or of sugar substitutes; chocolate; chocolate products, namely, chocolate candy, chocolate pralines, chocolate bars, chocolate candy figures; chocolate tablets; pastries";[6]

- for "confectionery made of sugar or of sugar substitutes;

---

mark consists of the brown word "DANKE" with outlines in beige. The entire mark is on a white background that is not claimed as a feature of the mark.

[2] 9 TTABVUE 12.

[3] Registration No. 843319; thrice renewed.

[4] Registration No. 2318584; twice renewed. "Prior to November 2, 2003, 'standard character' drawings were known as 'typed' drawings. A typed or typeset mark is the legal equivalent of a standard character mark." *Heil Co. v. Tripleye GmbH*, No. 91277359, 2024 WL 4925901, at *26 n.121 (TTAB 2024) (citing *In re Viterra Inc.*, 671 F.3d 1358, 1363 n.2 (Fed. Cir. 2012)).

[5] Registration No. 5293886; Section 8 accepted and Section 15 acknowledged.

[6] Registration No. 5993326.

chocolate; chocolate products, namely, chocolate candy, chocolate pralines, chocolate bars, chocolate tablets, chocolate candy figures; pastries; ice-cream; preparations for making the aforementioned products, namely, cocoa powder, cake mixes, cookie mixes, pastry cream, mixes for making ice-cream, caramel based spread for pastries and chocolates, chocolate based spread for pastries and chocolates, coffee mixes, coffee based spread for pastries and chocolates, coffee extracts, and marzipan";[7]

- MERCI TOGETHER (standard character) for "confectionery made of sugar or of sugar substitutes; chocolate; chocolate products, namely, chocolate candy, chocolate pralines, chocolate bars, chocolate candy figures; pastries; ice-cream; preparations for making the aforementioned goods, included in this class";[8] and

- MERCI BLACK & WHITE SELECTION (standard characters) with "BLACK & WHITE SELECTION" disclaimed for "confectionery made of sugar or of sugar substitutes; chocolate; chocolate products, namely, chocolate candy, chocolate pralines, chocolate bars, chocolate tablets, chocolate candy figures; pastries; ice-cream; preparations for making the aforementioned products, namely, cocoa powder, cake mixes, cookie mixes, pastry cream, mixes for making ice-cream, caramel based spread for pastries and chocolates, chocolate based spread for pastries and chocolates, coffee mixes, coffee based spread for pastries and chocolates, coffee extracts, and marzipan."[9]

---

[7] Registration No. 6248192. The colors red, gold, light brown, dark brown, blue, green, purple, and beige are claimed as features of the mark. The mark consists of the word "MERCI", the "I" dotted with a heart, beneath the design of individually wrapped chocolates grouped together in a vertical position upon a shaded rectangle and the bottom side of the rectangle is curved upward with a gold color outline becoming progressively wider from the left side to the right side. The individually wrapped chocolates are a rectangular shape with the length greater than the width and the width greater than the height and in the center of the length is an indentation across the width, and the wrapper is a rectangular shape with a gold background color on one half of the wrapper and clear on the other half of the wrapper. The candy configuration is visible through the clear half of the wrapper, and the word "merci" in lowercase letters is engraved on the candy. There is a colored band around the gold wrapper nearest the center of the rectangle, and the word "MERCI" in gold color lowercase letters is on the band in a repeating arrangement around the configuration. The color red appears in the shaded rectangle, the heart, and the chocolate wrapper. The color gold appears in the word "MERCI", and the chocolate wrappers. The color dark brown appears in the chocolates and the chocolate wrapper. The colors purple, beige, light brown, green, and blue appear in the chocolate wrappers. An L-shaded red outline appears on the left and bottom sides of the mark.

[8] Registration No. 6192251.

[9] Registration No. 6350838.

For each registration except one,[10] Opposer translates "merci" as "thank you" or "thanks."

Applicant's operative answer admits that Opposer appears in the United States Patent and Trademark Office (USPTO) database as the current owner of its pleaded registrations[11] and denies the remainder of the salient allegations.[12] Applicant asserted the affirmative defenses of estoppel, waiver, bad faith and unclean hands,[13] but did not pursue these defenses at trial, and they are thus deemed impliedly waived. *Keystone Consol. Indus. v. Franklin Inv. Corp.*, No. 92066927, 2024 WL 3771168, at *2 n.10 (TTAB 2024) ("Affirmative defenses that were asserted in an answer but then not pursued at trial may be deemed impliedly waived, while affirmative defenses that were never asserted may be deemed forfeited.").

The opposition is fully briefed. As plaintiff in this proceeding, Opposer bears the burden of establishing its entitlement to a statutory cause of action and its Section 2(d) claim by a preponderance of the evidence. *See Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 998 (Fed. Cir. 2020) (citation omitted); *Jansen*

---

[10] MERCI FINEST MOMENTS, Registration No. 5993326, does not contain a translation statement.

[11] 13 TTABVUE 3-4, ¶ 8.

[12] *Id.* at 2-5.

[13] *Id.* at 9, ¶¶ 32-34. Applicant asserted additional purported affirmative defenses which are not true affirmative defenses (*id.* at 6-11 ¶¶ 1-31, 35-39), so we do not address them as such. *See, e.g.*, *DeVivo v. Ortiz*, No. 91242863, 2020 WL 1227592, at *1 (TTAB 2020) (mere amplifications of the applicant's denials not considered as separate affirmative defenses); *John W. Carson Found. v. Toilets.com, Inc.*, No. 91181092, 2010 WL 1233881, at *9 (TTAB 2010) ("The asserted defense of failure to state a claim is not a true affirmative defense because it relates to an assertion of the insufficiency of the pleading of opposer's claim rather than a statement of a defense to a properly pleaded claim.").

*Enters. Inc. v. Rind*, No. 92042871, 2007 WL 809857, at *2 (TTAB 2007). We have considered all of the admissible evidence of record and arguments made by the parties. For the reasons discussed below, we dismiss the opposition.[14]

## I. The Record

The record includes the pleadings, the file of the opposed Application pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), and the following evidence that the parties introduced during trial.[15]

### A. Opposer's Evidence

- Declaration of Kelly Cook, President of Storck USA, L.P., a subsidiary of Opposer, with exhibits regarding Opposer's marketing, promotion and advertising of its marks;[16]

- Declaration of Antje Baumgardt, Opposer's Marketing Director Chocolate Specialties & Fresh Products, with exhibits, regarding Opposer's marketing and promotion of its marks including DANKE HEIßT MERCI;[17] and

- Notices of Reliance on TSDR printouts of Opposer's pleaded registrations showing their current title and status;[18] Applicant's answers to select

---

[14] Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *See New Era Cap Co. v. Pro Era, LLC*, No. 91216455, 2020 WL 2853282, at *1 n.1 (TTAB 2020). The number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear.

[15] Both parties submitted under notices of reliance printouts from various websites. Although admissible for what they show on their face, *see* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence ordinarily constitutes hearsay that may not be relied upon for the truth of the matters asserted unless supported by testimony or other evidence. Fed. R. Evid. 801(c); *see, e.g., Optimal Chem. Inc. v. Srills LLC*, No. 92063200, 2019 WL 4316700, at *3 n.13 (TTAB 2019) (website printouts are hearsay and admissible under notice of reliance for what they show on their face but may not be relied upon for the truth of the matters asserted unless supported by testimony or other evidence).

[16] 17 TTABVUE.

[17] 18 TTABVUE.

[18] 19 TTABVUE.

interrogatories and its responses to select requests for admissions;[19] Internet materials;[20] and portions of the file history of a prior TTAB proceeding involving Opposer.[21]

### B. Applicant's Evidence

- Notices of Reliance on third-party registrations;[22] Opposer's admissions to certain requests for admission and documents authenticated through such admissions;[23] census information[24] and Internet materials.[25]

### C. Evidentiary Objections

Applicant raised numerous objections buried in its main brief seeking to exclude evidence that is not outcome-determinative.[26] To the extent Applicant raises for the first time in its brief procedural objections (such as lack of authentication or foundation) that could have been remedied or obviated had they been made earlier, the objections are untimely. *See Sabhnani v. Mirage Brands, LLC*, No. 92068086, 2021 WL 6072822, at *6 (TTAB 2021) (lack of foundation objection waived, objecting party did not timely move to strike). We decline to exclude exhibits and evidence on this basis.

As to Applicant's objections and arguments relating to probative value, in general,

> the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations … we find no basis on which to strike any testimony or other evidence. As

---

[19] 20 TTABVUE.

[20] 21 TTABVUE.

[21] 26 TTABVUE.

[22] 22 TTABVUE.

[23] 23 TTABVUE.

[24] 24 TTABVUE.

[25] 25 TTABVUE.

[26] 33 TTABVUE 23-25.

necessary and appropriate, we will point out any limitations in the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. We have considered all of the testimony and evidence introduced into the record. In doing so, we have kept in mind the various objections raised by the parties and we have accorded whatever probative value the subject testimony and evidence merit.

*Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, No. 91190827, 2017 WL 542344, at \*2 (TTAB 2017); *see U.S. Playing Card Co. v. Harbro, LLC*, No. 91162078, 2006 WL 3704640, at \*4 (TTAB 2006).

To the extent we rely on any of the objected-to evidence, we keep in mind any deficiencies and have accorded to such evidence whatever probative value it merits. *U.S. Playing Card*, 2006 WL 3704640, at \*4.

## II. Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action is an element of the plaintiff's case in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303 (Fed. Cir. 2020). To establish entitlement to a statutory cause of action in an opposition proceeding, an opposer must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration of the mark. *Id.*

Opposer's entitlement to oppose registration of Applicant's mark is established by its unchallenged pleaded registrations which Opposer properly entered into the record by way of notice of reliance.[27] *See, e.g.*, *Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, No. 91263919, 2022 WL 16646840, at \*6 (TTAB 2022) (valid and

---

[27] 19 TTABVUE 4-19.

subsisting pleaded registration establishes opposer's direct commercial interest in the proceeding and its belief in damage for purposes of Section 2(d) claim) (citing *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000)).

## III.   Section 2(d) Claim

Trademark Act Section 2(d) prohibits the registration of a mark that

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States . . . and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1052(d); *see also Cunningham*, 222 F.3d at 946; *Life Zone Inc. v. Middleman Grp. Inc.*, No. 91160999, 2008 WL 2781162, at *6 (TTAB 2008).

### A.   Priority

Under Section 2(d), an opposer must prove ownership of a prior-filed application or a registration, or else prove priority of use. Where, as here, an opposition is based on ownership of registered marks, those registrations are of record, and the applicant has not counterclaimed to cancel them, priority is not at issue with respect to the registered marks for the identified goods. *See, e.g.*, *New Era Cap*, 2020 WL 2853282, at *10; *Top Tobacco LP v. N. Atl. Operating Co.*, No. 91157248, 2011 WL 6099691, at *6 (TTAB 2011) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400 (CCPA 1974)); *Itel Corp. v. Ainslie*, No. 91072956, 1988 WL 252407, at *2 (TTAB 1988) ("[B]ecause of the existence of opposer's valid and subsisting registration, it

need not prove prior use as to the services recited therein."). Opposer has priority based on its pleaded registered marks for the goods identified in the registrations.[28]

Opposer also attempts to show prior common law rights in the mark DANKE HEIßT MERCI by introducing under notice of reliance printouts dated May 15, 2023 from AMAZON.COM. The printouts are mostly blurry and illegible; however, we can ascertain Opposer's DANKE HEIßT MERCI mark along with the description "Merci Fine Marzipan Chocolates Candy Original German Chocolate," which are listed for sale.[29] Aside from the fact that the printouts constitute hearsay and cannot be used to prove a date of first use in commerce, the date of these printouts is after Applicant's priority filing date of March 26, 2021. *See Spiritline Cruises LLC v. Tour Mgmt. Servs., Inc.*, No. 91224000, 2020 WL 636467, at *3 (TTAB 2020) (Internet printouts properly introduced under a notice of reliance without supporting testimony are considered only for what they show on their face rather than for the truth of the matters asserted therein). There is no testimony that establishes use of DANKE

---

[28] Opposer also asserts that it has used the mark DANKE HEIßT MERCI/DANKE HEIST MERCI in Germany and on German websites. 29 TTABVUE 6; 18 TTABVUE 3 (Antje Baumgardt, Opposer's Marketing Director testified that the "trademark 'Danke heißt merci' is used on [Opposer's] merci website at www.merci.de/de/start" and the goods bearing the DANKE HEIßT MERCI mark and appears on the "Amazon.de website in connection with the sale of Merci chocolates."). Opposer argues that delivery to the United States of its products is available but there is no evidence of record that any sales to U.S. consumers were made via these German websites before Applicant's constructive use date. 29 TTABVUE 8. Use in Germany and on German websites without distribution or sales to the U.S. is insufficient to establish common law rights in the mark in the United States. *Meenaxi Enters., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1074 (Fed. Cir. 2022) ("With respect to international usage, a trademark right generally extends only to countries in which the mark is used."); *In re Well Living Lab Inc.*, No. 86440401, 2017 WL 2876809, at *4 n.10 (TTAB 2017) (foreign websites' probative value depends on the extent to which they are accessible to and viewed by U.S. consumers).

[29] 21 TTABVUE 13-17.

HEIßT MERCI in the United States before Applicant's priority date. *See id.* Opposer thus has not proven priority in the DANKE HEIßT MERCI/DANKE HEIST MERCI common law mark, and we therefore give no further consideration to Opposer's Section 2(d) claim based on this mark.

## B. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative evidence of record bearing on the likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (setting forth factors to be considered) ("*DuPont*"). We consider the likelihood of confusion factors for which there is evidence and argument. *In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019). "Not all of the *DuPont* factors are necessarily 'relevant or of equal weight in a given case, and any one of the factors may control a particular case.'" *Citigroup Inc. v. Cap. City Bank Grp. Inc.*, 637 F.3d 1344, 1355 (Fed. Cir. 2011) (quoting *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003)); *In re Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed. Cir. 1993) ("the various evidentiary factors may play more or less weighty roles in any particular determination"). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

### 1. Initial Matter – Focusing Our Analysis on MERCI Registration

In determining Opposer's likelihood of confusion claim, we focus on Opposer's typed mark MERCI that is the subject of the Registration No. 2318584 for "chocolate and chocolates" in International Class 30 (the "'584 Mark" or "'584 Registration") because it is the closest of Opposer's pleaded marks to Applicant's mark. If confusion is likely between this mark and Applicant's mark for the goods identified in the registration, there is no need for us to consider whether there is a likelihood of confusion with respect to the other pleaded marks; conversely, if there is no likelihood of confusion between Applicant's mark and this mark, then there would be no likelihood of confusion with respect to the other pleaded marks. *See Sock It To Me, Inc. v. Fan*, No. 91230554, 2020 WL 3027605, at *9 (TTAB 2020) (confining Section 2(d) analysis to most similar pleaded mark) (citing *N. Face Apparel Corp. v. Sanyang Indus. Co.*, No. 91187593, 2015 WL 6467820, at *7 (TTAB 2015)).

### 2. Similarity or Dissimilarity of the Marks

Under the first *DuPont* factor, we determine the similarity or dissimilarity of the marks in their entireties, taking into account their appearance, sound, connotation and commercial impression.[30] *DuPont*, 476 F.2d at 1361.

The issue is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of

---

[30] Applicant asserts that the Examining Attorney approved the Application after conducting a search of "the USPTO database … and found no conflicting marks." 33 TTABVUE 9 (emphasis omitted). The Board is not bound by the examining attorney's findings or decisions. If we were, there would be no need for statutorily mandated opposition proceedings pursuant to 15 U.S.C. § 1063.

their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. *Coach Servs., Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 1368 (Fed. Cir. 2012). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *Sage Therapeutics, Inc. v. Sageforth Psych. Servs., LLC,* No. 91270181, 2024 WL 1638376, at *5 (TTAB 2024) (quoting *In re i.am.symbolic, llc,* No. 85916778, 2018 WL 3993582, at *4 (TTAB 2018)). We keep in mind that where, as here, the goods are identical and legally identical, as discussed in more detail herein,[31] "'the degree of similarity necessary to support a conclusion of likely confusion declines.'" *Viterra,* 671 F.3d at 1363 (quoting *Century 21 Real Estate Corp. v. Century Life of Am.,* 970 F.2d 874, 877 (Fed. Cir. 1992)).

a. Applicability of the Doctrine of Foreign Equivalents

As a threshold matter, we note that the parties concentrate much of their briefing on the applicability of the doctrine of foreign equivalents.[32] Under the doctrine of foreign equivalents, foreign words used as a mark are translated into English and then tested for likelihood of confusion. *In re Vetements Grp. AG,* 137 F.4th 1317, 1325 (Fed. Cir. 2025). Generally, the Board applies the doctrine of foreign equivalents when one mark is in the English language and the other is in a foreign language. *Ricardo Media Inc. v. Inventive Software, LLC,* No. 91235063, 2019 WL 3956987, at *8 (TTAB 2019). In certain circumstances, however, the Board has applied the

---

[31] *See* discussion in Section III(B)(4).

[32] Opposer's Brief, 29 TTABVUE 18-22; Applicant's Brief, 33 TTABVUE 11-19; Rebuttal Brief, 37 TTABVUE 7-10.

doctrine of foreign equivalents when considering two marks from different foreign languages or from the same foreign language. *Miguel Torres S.A. v. Casa Vinicola Gerardo Cesari S.R.L.*, 49 USPQ2d 2018 (TTAB 1998) (translating marks in Italian and Spanish); *In re Lar Mor Int'l, Inc.*, 1983 WL 51840, at *2 (TTAB 1983) (comparing marks TRES JOLIE and BIEN JOLIE because U.S. consumers with even a "rudimentary" understanding of French would understand the meaning of the marks based on the nature of the terms).

Having considered the parties' arguments and evidence of record, we find it appropriate to apply the doctrine to these marks. French and German are common, modern languages.[33] The record further demonstrates that the ordinary U.S. purchaser would stop and translate the French and German words for "thank you." The record includes printouts from U.S. English dictionaries defining "merci" as a French interjection meaning "thank you" and defining "danke" as a German interjection meaning "thank you."[34] "Thank you" is an everyday, commonplace

---

[33] We take judicial notice of the August 2022 United States Census Bureau's "Language Use in the United States: 2019" report which indicates that after English, French is the third most common language in the United States and German is the sixth most common language.WWW.CENSUS.GOV/CONTENT/DAM/CENSUS/LIBRARY/PUBLICATIONS/2022/ACS/ACS-50.PDF. *In re Weiss Watch Co.*, Ser. No. 86782562, 2017 WL 2876824, at *4 (TTAB 2017) (Board "recognize[s] that German is a major, modern language," takes judicial notice of U.S. Census data "showing German is spoken in 1,109,216 U.S. households in 2009"); *In re Tokutake Indus. Co.*, Ser. No. 79018656, 2008 WL 2075681, at *3 n.1 (TTAB 2008) (Board may take judicial notice of U.S. census data).

[34] *See, e.g.*, 21 TTABVUE 45, COLLINSDICTIONARY.COM defining "merci" in U.S. English as a French interjection meaning "thank you"; *id*. at 64, COLLINSDICTIONARY.COM defining "danke" in U.S. English as a German interjection meaning "thank you"; *id*. at 51-52, Random House Unabridged Dictionary retrieved from DICTIONARY.COM, defining "danke" as a German interjection meaning "thank you" and indicating that words related to danke are "thanks, gracias, merci, much obliged"; and *id*. at 74, MERRIAM-WEBSTER.COM defining

expression, and thus many members of the U.S. public, even those who have only a rudimentary acquaintance with French and German, are likely to understand the significance of the respective terms. *Vetements*, 137 F.4th at 1327 (holding it was appropriate for the Board to apply the doctrine of foreign equivalents to the French word "vetements" because, among other things, "the word in question is a simple and common word—the word for clothing").

The fact that MERCI and DANKE appear in U.S. English dictionaries, defined as foreign terms, establishes that U.S. consumers are likely to be familiar with both foreign language words and translate the words to understand their English meaning. *Cf. Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,* 786 F.3d 960, 965 (Fed. Cir. 2015) ("Evidence of the public's understanding of a proposed mark may be obtained 'from any competent source, such as consumer surveys, dictionaries, newspapers and other publications.'") (quoting *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 1559 (Fed. Cir. 1985)); *Tea Bd. of India v. Republic of Tea, Inc.*, No. 91118587, 2006 WL 2460188, at *22 (TTAB 2006) ("Dictionaries can be strong evidence of the commonly understood meaning of a term."). Opposer's additional evidence likewise establishes the ordinary U.S. purchaser is likely to stop and translate DANKE. Opposer submitted evidence that the Urban Dictionary defines the term as "A word of Germanic origin, meaning thanks/thank you; commonly used

---

"danke schoen" as a German phrase meaning "thank you very much." We also take judicial notice that MERRIAM-WEBSTER.COM defines "merci beaucoup" as a French phrase meaning "thank you very much." *See* https://www.merriam-webster.com/dictionary/merci (last visited May 29, 2025).; *see also In re Nextgen Mgmt., LLC*, No. 88098031, 2023 WL 111145, at *4 n.5 (TTAB 2023) ("The Board may take judicial notice of dictionary definitions, including online dictionaries which exist in printed format or have fixed regular editions.").

in … chatrooms and forums" and includes sample chatroom transcripts that include the term.[35] *In re Lizzo LLC*, No. 88466264, 2023 WL 1507238, at *5 (TTAB 2023) (Urban Dictionary evidence considered because corroborated by other sources); *see also In re Brunetti*, 877 F.3d 1330, 1338-39 (Fed. Cir. 2017) (a definition from the Urban Dictionary may be probative where appropriately considered).[36] Entry of the word "danke" in the Urban Dictionary further establishes that U.S. consumers will know its meaning.

In light of the preceding discussion, we find Applicant's arguments that the doctrine should not be applied because consumers will not translate two foreign language marks and French is not a common, modern language, or that Opposer's adoption in 2013 of the slogan "Thank You means Merci" is a tacit acknowledgement "that consumers require education about the meaning of "Merci',"[37] to be unpersuasive. Applicant has not demonstrated that it is unlikely that U.S. consumers will stop and translate these terms. *See Vetements*, 137 F.4th at 1331 ("[T]he burden is on the party opposing translation to show that it is unlikely the ordinary [U.S.] purchaser would stop and translate the word into its English equivalent. Placing the burden on a party opposing translation takes into account the well-recognized tenet

---

[35] 21 TTABVUE 82, URBANDICTIONARY.COM.

[36] Applicant does not rebut or otherwise call into question the accuracy of this evidence from Urban Dictionary. *In re Star Belly Stitcher, Inc.*, No. 85247730, 2013 WL 4635976, at *4 n. 3 (TTAB 2013) ("[T]he Board will consider dictionary definitions taken from the Urban Dictionary so long as the non-offering party has an opportunity to rebut that evidence by submitting other definitions that may call into question the accuracy of the particular Urban Dictionary definitions ... [and] with the recognition of the limitations inherent in this dictionary, given that anyone can submit or edit the definitions.").

[37] 33 TTABVUE 15.

that 'words from modern languages are generally translated into English.'") (cleaned up).

Based on the evidence of record, an appreciable number of U.S. purchasers are capable of translating MERCI and DANKE, and in the context of the marks' use with chocolate,[38] a purchaser with ordinary sensibilities would translate the wording. *See Vetements,* 137 F.4th at 132-298 ("[W]e consider if the context in which the words appear would cause the ordinary American purchaser to take the [mark] at face value" rather than translate it). For all of these reasons, we apply the doctrine of foreign equivalents and we consider the U.S. English meaning of the marks in comparing their similarity because we find that U.S. consumers will understand their meanings. Therefore, we find that the MERCI and DANKE marks would be understood by U.S. consumers to mean "thank you."

b. Comparison of the Marks

We now compare Applicant's stylized mark **DANKE** with Opposer's '584 Mark MERCI.

We find that the marks are highly dissimilar in appearance and sound. **DANKE** is pronounced "DAHN-kuh" whereas MERCI is pronounced "mehr-SEE".[39] The marks look and sound nothing alike. To state the obvious, **DANKE** and MERCI do not share

---

[38] *See* discussion of evidence below showing that chocolate is often promoted as a "thank you" gift.

[39] 33 TTABVUE 20; *see* 21 TTABVUE 45, 64.

any letter strings and although they are both two-syllable terms, overall they are quite dissimilar in appearance and sound.[40]

Where the parties focus their arguments is in the marks' respective connotations and commercial impressions. As discussed above, U.S. consumers are likely to understand that both marks mean "thank you." Thus, they share the connotation of gratitude. But as discussed below, the message of "thanks" is widely used in the industry and pervasively associated with chocolate. Further, when it comes to commercial impression, because the marks are derived from different foreign languages and have distinct appearances and pronunciations, we find the marks are somewhat dissimilar overall in commercial impression, despite sharing an identical meaning.

In sum, the marks are very different in overall appearance and sound and have somewhat distinct overall commercial impressions. We are not convinced by Opposer's argument that these differences are outweighed by the marks' "exact same connotation and meaning,"[41] particularly because the shared meaning is a common message related to chocolate. Rather, we find the differences in sound and appearance and the differences in commercial impression outweigh the marks' identical meaning

---

[40] We are not persuaded by Applicant's argument that the stylization of its mark "enhance[s] the uniqueness of the 'DANKE' mark and provide[s] additional differentiation in the marketplace." 33 TTABVUE 20. Because the '584 Mark is in typed format (the legal equivalent of a standard character mark), it could be presented in the same manner as Applicant's mark, *i.e.*, in the same font, style, size and color. *See Viterra*, 671 F.3d at 1363; *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, No. 91194148, 2015 WL 5316485, at *8 (TTAB 2015) (citing *Citigroup*, 637 F.3d at 1349).

[41] Opposer's Brief, 29 TTABVUE 21.

and weigh strongly against a finding of likelihood of confusion. *See Sarkli*, 721 F.2d at 355 ("But where the only similarity between the marks is connotation, a much closer approximation is necessary than has been shown here to justify a refusal to register on that basis alone where the marks otherwise are totally dissimilar."). The first factor therefore weighs against a finding of likelihood of confusion.

### 3. Strength/Weakness of Opposer's Mark

We now consider the strength or weakness of Opposer's mark MERCI as used in connection with chocolate because such a determination helps inform us as to its scope of protection. *See Made in Nature, LLC v. Pharmavite LLC*, No. 91223352, 2022 WL 2188890, at *11-12 (TTAB 2022) (quoting *DuPont*, 476 F.2d at 1361). When evaluating the strength or weakness of a mark, we look at the mark's inherent strength based on the nature of the term itself, and its commercial strength in the marketplace. *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1362-63 (Fed. Cir. 2023) ("Two of the *DuPont* factors (the fifth and sixth) consider strength." The fifth factor measures a mark's marketplace strength while the sixth factor addresses both conceptual and commercial strength); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010) (measuring both conceptual and marketplace strength); *see also Made in Nature*, 2022 WL 2188890, at *11-12 (quoting *DuPont*, 476 F.2d at 1361); *New Era Cap*, 2020 WL 2853282, at *12 ("[T]he strength of a mark is not a binary factor, but varies along a spectrum from very strong to very weak.") (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 1345 (Fed. Cir. 2003)). The fifth *DuPont* factor enables an opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of the fame of the prior mark (sales, advertising,

length of use). By contrast, the sixth *DuPont* factor allows an applicant to argue that confusion is less likely by adducing evidence of conceptual and commercial weakness. *Spireon*, 71 F.4th at 1362. For the reasons explained, we find that the thirteenth *DuPont* factor, any other established fact probative of the effect of use, also is implicated here.

### a. Fifth *DuPont* Factor

Turning to commercial strength or fame under the fifth *DuPont* factor, "[a] mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark." *Omaha Steaks*, 908 F.3d at 1319 (quoting *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)); *Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 851 (Fed. Cir. 1992) (citation omitted) ("A well-known mark enjoys an appropriately wider latitude of legal protection, for similar marks tend to be more readily confused with a mark that is already known to the public."). Such strength rests on the extent to which "a significant portion of the relevant consuming public … recognizes the mark as a source indicator." *Joseph Phelps Vineyards Holdings, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1324-25 (Fec. Cir. 2017) (citing *Palm Bay Imps*, 396 F.3d at 1374-75 (Fed. Cir. 2005)). In the context of a likelihood of confusion analysis, the commercial strength of a mark is not a binary factor. Rather, it "varies along a spectrum from very strong to very weak." *Joseph Phelps Vineyards*, 857 F.3d at 1325 (quoting *Palm Bay Imps.*, 396 F.3d at 1374-75).

Under the fifth factor, commercial strength or fame may be measured not only directly by consumer surveys or declarations but also indirectly by the volume of sales

and advertising expenditures in connection with the identified goods or services sold under the mark, and supported by other indicia such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; the general reputation of the goods or services; and social media presence. *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, No. 91199352, 2014 WL 343269, at *6 (TTAB 2014); *see also Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002) (recognizing indirect evidence as appropriate proof of strength). Depending on the industry, some context in which to place raw statistics may be necessary (e.g., the substantiality of the sales or advertising figures for comparable types of products or services). *Bose*, 293 F.3d at 1375.

A high degree of fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark falls on the higher end of the commercial strength of fame spectrum to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, No. 91160856, 2007 WL 749713, at *5 (TTAB 2007) ("It is the duty of a party asserting that its mark is famous to clearly prove it.") (citation omitted), *cited in Coach Servs.*, 668 F.3d at 1367.

The record demonstrates use of Opposer's MERCI mark on chocolate since 1965[42] throughout the U.S.[43] in various national retail stores including Walmart, Kroger, Walgreens, CVS, Target, Publix, Dollar General, Aldo, Costco and Albertsons.[44] The MERCI mark "is displayed on the product packaging, on the product wrapper and engraved on the chocolate bar."[45] Opposer's President testifies that Opposer's total sales from 2017-2022 in the U.S. were in excess of $100 million;[46] and that its presence on social media marketing platforms from 2017-2022 is "significant" with 105,000 followers on Instagram and Facebook combined, "390 million impressions, 1.5 million engagements, 9 million video views, and 565,000 link clicks."[47] Opposer did not make of record its annual U.S. advertising figures.[48] Instead, Opposer points to its promotional efforts which include advertisements in online publications such as Martha Stewart, Real Simple, Taste of Home and Reader's Digest,[49] as well as, "[f]or over 20 years," commercials on television channels including Bravo TV, the

---

[42] Baumgardt Declaration, 18 TTABVUE 3, ¶ 5.

[43] Cook Declaration, 17 TTABVUE 3, ¶ 10; *id.* at 11-42 (invoices from 2006-2023 for customers in various states including Maine, Illinois, Oregon, Rhode Island, Texas, Pennsylvania, Wisconsin, and Kentucky).

[44] *Id.* at 3, 5, ¶¶ 7, 18; *id.* at 61-65.

[45] *Id.* at 2, ¶ 6.

[46] *Id.* at 5, ¶ 21; *see id.* at 11-42.

[47] *Id.* at ¶ 22.

[48] Opposer argues, without evidentiary support, that the "ad expenditures necessary to sell Opposer's products in more than 100 countries clearly is [sic] significant." 37 TTABVUE 13. "Attorney argument is no substitute for evidence." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 1371 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005)).

[49] Cook Declaration, 17 TTABVUE 5, ¶ 19; *id.* at 66-70.

Hallmark Channel, the Oprah Winfrey Network, and during TV shows such as the Kelly Clarkson Show, Modern Family, Inside Edition and Access Hollywood.[50] In December 2021, MERCI chocolate commercials "were broadcast approximately two thousand (2,000) times," and "have been viewed by millions of consumers."[51]

Applicant criticizes Opposer's marketplace evidence arguing that "Opposer lumps together all its registered marks without demonstrating which specific marks have gained distinctiveness and strength individually";[52] and that although Opposer has listed geographic locations its commercials have aired,

> there are no details involving ad expenditures, merely a listing of locations where the commercials involving the Merci Marks have been broadcasted. This has little probative value and may also be misleading, because the Board will be unable to have a proper understanding of how advertising expenditures for the brand translate into whether customers recognize Opposer's marks. Opposer does not contextualize advertising efforts.[53]

Opposer's evidence of sales and marketing efforts are indeed provided without context. *See Omaha Steaks Int'l*, 908 F.3d at 1320 (quoting *Bose*, 293 F.3d at 1375 ("raw numbers alone in today's world may be misleading.")). Notwithstanding the lack of market share evidence or other evidence to put Opposer's sales and marketing figures into context (e.g. how Opposer's MERCI products rank in terms of sales in the trade), Opposer's decades of use and advertising of the MERCI mark and U.S. sales

---

[50] *Id.* at 5-6, ¶ 23; *id.* at 82-84.

[51] *Id.* at 6, ¶ 23.

[52] 33 TTABVUE 21.

[53] *Id.* at 22 (emphasis omitted).

in excess of $100 million from 2017-2022 supports that the mark has some commercial strength in the marketplace.

We are focused on Opposer's registered MERCI mark in typed format, which the evidence shows appears prominently on Opposer's product packaging, is engraved on its chocolate bars, and is featured in its advertising, including television, online publications, social media and in-store sale displays as shown in the television advertising screenshots below.[54]

---

[54] Cook Declaration, 17 TTABVUE 2-3, ¶¶ 6, 9; *id.* at 5-6, ¶¶ 18-20, 22-23; *id.* at 43-84.



.[55]

As to Opposer's social media presence, Applicant argues that when compared to famous well-known U.S. chocolate brands such as SNICKERS with "703k followers

---

[55] *Id.* at 84.

on Instagram … and 9.[1] million on Facebook"[56] and HERSHEY'S with "505k followers on Instagram … and 9.[2] million on Facebook,"[57] Opposer's social media presence is "modest at best, with only 11.5k followers on Instagram … and 92,000 on Facebook."[58] Applicant notes that Opposer's Facebook page "content [is] unavailable as recently as April 1, 2024."[59] The number of followers listed on the third-party website printouts is hearsay. But even if Opposer's social media presence were not as great as that of its competitors, Kelly Cook's testimony regarding Opposer's social media exposure reflects actual consumer traffic and exposure to its MERCI products indicating that there is some level of consumer awareness of Opposer's products. *See GJ & AM*, 2021 WL 2374670, at \*21 (evidence of consumer reviews "somewhat probative that there were at least 1,000 purported purchasers of Applicant's products who wrote reviews for the product").

Applicant argues that "Opposer has failed to provide any substantive evidence demonstrating the extent of actual recognition by the American public for its mark … Instead, Opposer['s] sole evidence is a printout of the Harris Poll."[60] Opposer's Harris Poll data is from June 2021-August 2022, which Opposer asserts indicates that "aided awareness of Merci chocolates among U.S. consumers over the age of

---

[56] 33 TTABVUE 21; *see* 25 TTABVUE 115-16, 128 (Applicant has identified the number of likes (9.3 million) as the number of followers which is listed as 9.1 million).

[57] 33 TTABVUE 21-22; *see* 25 TTABVUE 117-18, 126 (Applicant has identified the number of likes (9.3 million) as the number of followers which is listed as 9.2 million).

[58] 33 TTABVUE 21; 17 TTABVUE 72, 75; 21 TTABVUE 35, 38.

[59] 33 TTABVUE 21; 25 TTABVUE 121.

[60] 33 TTABVUE 23.

eighteen (18) was approximately 50%."[61] Opposer submits a table purporting to show the poll results without any details about the methodology except to say it used "aided awareness." "In general, the Board has discouraged heavy reliance on aided awareness to prove fame." *Promark Brands Inc. v. GFA Brands, Inc.*, No. 91194974, 2015 WL 1646447, at *13 (TTAB 2015) (citing *Carefirst of Md., Inc. v. Firsthealth of the Carolinas, Inc.*, No. 91116355, 2005 WL 2451671, at *16-17 (TTAB 2005), *aff'd*, 479 F.3d 825 (Fed. Cir. 2007)). Opposer's poll utilizing aided awareness lacks significant evidentiary value. *Id.* (The Board held that because the survey questions "recited the SMART ONES mark among the 6 suggested responses, we find the results of [the] aided awareness question to lack significant evidentiary value on the question of fame.").

We find that, taken together, the evidence discussed above suggests a moderate level of commercial success and brand recognition. We find that MERCI has moderate commercial strength on the fame spectrum under the fifth *DuPont* factor.

### b. The Sixth and Thirteenth *DuPont* Factors

Applicant did not challenge the commercial strength of Opposer's mark MERCI by introducing evidence of third-party marketplace use of similar marks for similar goods. *See Juice Generation, Inc. v. GS Enters. LLC,* 794 F.3d 1334, 1338-39 (Fed. Cir. 2015) (evidence of third-party trademark use bears on commercial strength under the sixth *DuPont* factor). We therefore start by considering the conceptual strength of the '584 Mark under the sixth factor. *Spireon,* 71 F.4th at 1362.

---

[61] Cook Declaration, 17 TTABVUE 6, ¶ 24; *see also id.* at 85.

Because the '584 Mark issued on the Principal Register without a claim of acquired distinctiveness under Trademark Act Section 2(f), the mark is presumed to be inherently distinctive for the goods listed in the registration. Trademark Act Section 7(b), 15 U.S.C. § 1057(b); *Tea Bd. of India*, 2006 WL 2460188, at *21 (a "mark that is registered on the Principal Register is entitled to all Section 7(b) presumptions including the presumption that the mark is distinctive and moreover, in the absence of a Section 2(f) claim in the registration, that the mark is inherently distinctive for the goods").

Nevertheless, if under the sixth *DuPont* factor there is evidence that a mark, or an element of a mark, is commonly used or registered by many different third parties for similar goods or services, that may indicate that the mark or common element has some conceptual weakness. *See, e.g., Spireon*, 71 F.4th at 1363 (citations omitted) (third-party registrations containing an element that is common to both the opposer's and the applicant's marks can show that that element has a normally understood and well-recognized, conceptually weak meaning); *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015) ("[E]vidence of third-party registrations is relevant to 'show the sense in which a mark is used in ordinary parlance,' . . . that is, some segment that is common to both parties' marks may have 'a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that segment is relatively weak.'") (quoting *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015)). Unlike the marks in *Spireon, Jack Wolfskin and Juice*

*Generation*, Opposer's and Applicant's marks do not share a "common" element; the only commonality is the similarity in meaning.

Moreover, Applicant submitted only one third-party use-based registration for a mark that includes the term "merci": for goods including "sauces,"[62] which is broad enough to include chocolate sauces.[63] *In re Country Oven, Inc.*, No. 87354443, 2019 WL 6170483, at \*5 (TTAB 2019) ("Just as we must consider the full scope of the goods and services as set forth in the application and registration under consideration, we must consider the full scope of the goods and services described in a third-party registration."). One third-party registration incorporating the word MERCI for similar goods falls far short of demonstrating that MERCI is conceptually weak under the sixth *DuPont* factor. *Sabhnani*, 2021 WL 6072822, at \*13 n.20 ("[I]n *Juice Generation*, there were at least twenty-six relevant third-party uses or registrations of record . . . and in *Jack Wolfskin*, there were at least fourteen.") (quoting *Morinaga Nyugyo*, 2016 WL 5219811, at \*9 n.8).

---

[62] 22 TTABVUE 24 (Registration No. 5478650).

[63] The remaining seventeen (17) live third-party use-based registrations are for THANK YOU-formative marks and word marks in languages other than French that translate to "thank you." Because these registered marks do not include the word MERCI as a common element, we do not find them persuasive under the sixth *DuPont* factor. Many of the third-party registrations also are not relevant because they identify goods that have not been proven related to chocolate. *See Omaha Steaks Int'l, Inc., v. Greater Omaha Packing Co.*, 908 F.3d 1315, 1324-25 (Fed. Cir. 2018). In addition, two of the registrations are cancelled, and thus, have no probative value. 22 TTABVUE 10-13, 65-67. *Made in Nature*, 2022 WL 2188890, at \*15 (disregarding cancelled third-party registrations because "[a] cancelled or expired registration has no probative value other than to show that it once issued and it is not entitled to any of the statutory presumptions of Trademark Act Section 7(b)").

But that is not the end of our analysis of the conceptual strength of Opposer's MERCI mark. As noted, the marks appear in two different foreign languages and the only similarity between the marks is in their meaning as "thank you." Applicant introduced the results of a Google® images search intended to show that "'Thank you' is commonly associated with goods made of chocolate."[64] Opposer counters that it has "developed a unique theme to say 'thank you' with candy."[65] We consider these arguments and relevant evidence under the thirteenth *DuPont* factor that allows us to consider any other established fact probative of the effect of use. *DuPont*, 476 F.2d at 1361.

A portion of the results of Applicant's Google® images search is reproduced below:[66]

---

[64] Applicant's Notice of Reliance, 25 TTABVUE 8, 100-09, ¶ 23 and Exhibit 45.

[65] 29 TTABVUE 22.

[66] Applicant's Notice of Reliance, 25 TTABVUE 100. Although Applicant argues that the common association of "thank you" with chocolates undercuts Opposer's argument that MERCI is a strong mark, *see* 33 TTABVUE 22, Applicant does not specify the *DuPont* factor under which these third party uses should be analyzed. *Id.* at 8, ¶23. Inasmuch as the third party uses do not appear to be trademark uses, we find they are pertinent to the 13th *DuPont* factor.



.67

<hr />

67 *Id.* at 100. Generally, search summaries in the nature of listings of websites have limited probative value because they are not the websites themselves and the information is truncated. *See Edom Labs. Inc. v. Lichter*, No. 91193427, 2012 WL 1267961, at *5 (TTAB 2012); *In re Int'l Bus. Machs. Corp.*, No. 75581859, 2006 WL 3704639, at *3 n.3 (TTAB 2006) (listings of search results from Google database of limited probative value because the excerpts are extremely truncated). The search evidence here is slightly different as it consists of image search results. Although truncated, we find the uncontroverted Google® images search results that Applicant introduced more probative than a typical search summary because they (i) include product images from which we can ascertain the nature of the uses,

The record shows that consumers will not perceive the theme of saying "thank you" with chocolate as a unique theme, but rather, would be influenced by the common, non-trademark use of "thank you" in connection with chocolate. *Cf. D.C. One Wholesaler, Inc. v. Chien*, No. 91199035, 2016 WL 7010638, at *7 (TTAB 2016) ("The widespread ornamental use of the phrase by third parties 'is part of the environment in which the [mark] is perceived by the public and ... may influence how the [mark] is perceived.'") (quoting *In re Hulting*, No. 77666826, 2013 WL 5407310, at *2 (TTAB 2013)); *In re Chung, Jeanne & Kim Co.*, No. 73369174, 1985 WL 72090, at *4 (TTAB 1985) (the common practice in the trade to use a design as an ornamental feature is evidence that the design is not unique or unusual in the field and that it will be viewed by the relevant public as ornamentation rather than as a trademark).

Based on the record, we find under the thirteenth *DuPont* factor that the shared meaning of the marks at issue, "thank you", is conceptually weak when used in relation to chocolate because consumers are conditioned to seeing this phrase used as an expression of gratitude. *Cf. In re Medline Indus., Inc.*, No. 87680078, 2020 WL 1485709, at *4 (TTAB 2020) ("we find, under the thirteenth *DuPont* factor, that the third-party non-trademark uses of shades of green on medical gloves tend to impair the cited Supplemental Register mark's ability to acquire distinctiveness, and to limit

---

(ii) identify the names of retailers, and (iii) in some instances suggest the chocolate is for sale (e.g., "in stock"). *See In re Wal-Mart Stores, Inc.*, No. 86261962, 2019 WL 193990, at *10 n.38 (TTAB 2019) ("Web-based information that includes greater context for the use of a term, such as a complete webpage, will have greater probative value in determining how a term is perceived").

its scope of protection if it did acquire distinctiveness."); *Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 675 (Fed. Cir. 1984) (in likelihood of confusion analysis, third-party use, including descriptive use, "can demonstrate the ordinary dictionary meaning of a term or the meaning of a term to those in the trade").

Our finding is consistent with Opposer's promotion of its MERCI mark, the mark's readily understood significance as meaning "thank you," and the fact that Opposer's chocolates can be and are used for "thank you" gifts.[68] For example, Opposer uses various slogans including, "Thank you means merci"; "the sweetest way to say thank you"; "Nothing says thank you like Merci"; and "This holiday season say thank you with Merci."[69] In other words, Opposer's product marketing underscores the conceptual weakness of the known meaning of term MERCI. Thus, under the thirteenth *DuPont* factor, we find that because the marks in two different foreign languages share only a similar meaning, and are otherwise different in appearance, sound, and commercial impression, the conceptual weakness of the meaning weighs against a finding of a likelihood of confusion.

In sum, while MERCI is not conceptually weak under the sixth *DuPont* factor, the common use of "thank you" in connection with chocolate supports that the meaning of the mark MERCI is conceptually weak under the thirteenth *DuPont* factor.

---

[68] Cook Declaration, 17 TTABVUE 3-4, ¶¶ 11-17.

[69] *Id.* at 44-45, 47-54, 56, 58, 66-72, 75, 77.

c. Summary

Based on the evidence as a whole, we find Opposer has proven moderate commercial strength in its MERCI mark for chocolate through impressive nationwide sales and advertising featuring the MERCI mark for several decades. We find that the fifth *DuPont* factor favors a finding of likelihood of confusion.

Applicant has not proven the mark MERCI is commercially or conceptually weak under the sixth *DuPont* factor so that factor is neutral. Applicant, however, has proven that the meaning of the mark MERCI is conceptually weak as its readily known meaning "thank you" is a common sentiment expressed with giving chocolate. Thus, the thirteenth factor weighs against a likelihood of confusion because the shared meaning of two foreign language marks is conceptually weak.

4. Similarity or Dissimilarity of the Goods, Trade Channels and Consumers

The second *DuPont* factor concerns the "similarity or dissimilarity and nature of the goods or services as described in an application or registration…," and the third *DuPont* factor concerns the "similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 476 F.2d at 1361.

The goods are literally or legally identical. Both the Application and the '584 Registration identify "chocolate." In addition, Opposer's identification of "chocolate" is broad enough to encompass Applicant's "chocolate bars." *See, e.g., Look Cycle Int'l v. Kunshan Qiyue Outdoor Sports Goods Co.*, No. 92079409, 2024 WL 3739358, at *5 (TTAB 2024); *Conopco, Inc. v. Transom Symphony Opco, LLC*, No. 91256368, 2022 WL 874335, at *7 (TTAB 2022) (quoting *In re Hughes Furniture Indus., Inc.*, No. 85627379, 2015 WL 1734918, at *3 (TTAB 2015) ("Applicant's broadly worded

identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'")).

Because the goods are identical and legally identical and there are no restrictions on trade channels or consumers in the Application and '584 Registration, we must presume that the goods travel through all of the same channels of trade to all of the same classes of purchasers.[70] *Cai*, 901 F.3d at 1372 ("With respect to similarity of the established trade channels through which the goods reach customers, the TTAB properly followed our case law and 'presume[d] that the identical goods move in the same channels of trade and are available to the same classes of customers for such goods....'").

These *DuPont* factors weigh in favor of finding a likelihood of confusion.

5. Purchasing Care

The fourth *DuPont* factor relates to "conditions under which and buyers to whom sales are made, i.e., 'impulse' vs careful, sophisticated purchasing." *DuPont*, 476 F.2d at 1361. Consumer sophistication, or a heightened degree of care when making a purchasing decision, may tend to minimize likelihood of confusion. *See, e.g., In re N.A.D., Inc.*, 754 F.2d 996, 999-1000 (Fed. Cir. 1985) (because only sophisticated purchasers exercising great care would purchase the relevant goods, there would be no likelihood of confusion merely because of the similarity between the marks NARCO and NARKOMED). Conversely, impulse purchases of inexpensive items are

---

[70] Indeed, Opposer asserts that the trade channels and consumers are the same, 29 TTABVUE 24, and Applicant does not dispute this assertion.

likely to be made with a lesser degree of care, increasing the likelihood of consumer confusion. *Palm Bay Imps.*, 396 F.3d at 1376 ("Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect.").

The record shows that some chocolates are promoted for sale at relatively low prices.[71] However, because neither Applicant's nor Opposer's identification of goods is limited to low-end, bargain priced chocolates on one hand or high-end expensive chocolates on the other, we must assume that both identifications include chocolates sold at all price ranges and quality. *See In re Jump Designs LLC*, No. 76393986, 2006 WL 1968602, at *5 (TTAB 2006). We further must assume that the types of buyers overlap to include both the sophisticated chocolate aficionado as well as the ordinary consumer. We must base our analysis "on the least sophisticated potential purchasers." *Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1325 (Fed. Cir. 2014) (internal quotation marks omitted). Ordinary consumers of chocolate are likely to exercise only ordinary care, and given the lack of price restrictions in the identifications, they may even buy inexpensive chocolate on impulse. *See Recot, v. Becton*, 217 F.3d 1322, 1329 (Fed. Cir. 2000) ("When products are relatively low-priced and subject to *impulse* buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing

---

[71] 29 TTABVUE 28. Opposer submits a retail display that is blurry but appears to list Opposer's product for $3.99 and an Amazon listing that reads "4 options from $14.95." 17 TTABVUE 43, 55. In addition, Ms. Cook testified that Opposer sells its MERCI chocolates through low-priced retailer Dollar General. 17 TTABVUE 3, ¶ 8.

care."). For these reasons, the fourth factor weighs in favor of finding a likelihood of confusion.

## IV.    Conclusion

The final step in analyzing likelihood of confusion is to weigh the *DuPont* factors for which there has been evidence and argument; and to "explain the results of that weighing;" and "the weight [we] assigned to the relevant factors." *Charger Ventures*, 64 F.4th at 1384. "No mechanical rule determines likelihood of confusion, and each case requires weighing of the facts and circumstances of the particular mark." *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346 (Fed. Cir. 2010).

Applicant's and Opposer's goods are literally and legally identical under the second *DuPont* factor, the trade channels and consumers for the parties' identical and legally identical goods are presumed to overlap under the third *DuPont* factor, and the goods may be subject to impulse purchase under the fourth *DuPont* factor. Thus, these factors weigh heavily in favor of finding likelihood of confusion.

Turning to the strength of Opposer's '584 Mark, Opposer's MERCI mark has moderate commercial strength in connection with chocolate and therefore, the fifth *DuPont* factor favors a finding of likelihood of confusion. Applicant has not demonstrated commercial or conceptual weakness of the MERCI mark under the sixth factor. This factor is therefore neutral. Nevertheless, under the thirteenth *DuPont* factor, we find the evidence reflects a conceptual weakness of the meaning of the word MERCI in connection with chocolate. Thus, the thirteenth factor weighs against finding a likelihood of confusion.

As to the comparison of the marks under the first *DuPont* factor, MERCI and **DANKE** both mean thank you. But because "thank you" is widely used in the industry and pervasively associated with chocolate, the similarity in meaning is outweighed by the significant differences between the marks in sound and appearance as well as the overall differences in commercial impression. The first factor thus weighs heavily against finding a likelihood of confusion.

Weighing the factors, we conclude that the substantial differences in sound, appearance and commercial impression of **DANKE** and MERCI under the first factor coupled with the conceptual weakness of "thank you" — the shared meaning of the terms and the only similarity between the marks — for chocolates under the thirteenth factor are dispositive and outweigh the other factors. *Cf. Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, 826 F.3d 1376, 1381-82 (Fed. Cir. 2016) ("a single *duPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks") (citing *Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, L.L.C.*, 600 F.3d 1343, 1346-47 (Fed. Cir. 2010) (same); *Heil*, 2024 WL 4925901, at *38 ("Any of the *DuPont* factors may play a dominant role.").

We conclude that confusion is unlikely.


**Decision:** The opposition is dismissed.